**UNITED STATES of America, Plaintiff,**

v.

**Edward NEMBHARD and James Wilson, Defendants.**

Crim. No. 80–80318.

United States District Court, E. D. Michigan, S. D.

Dec. 4, 1980.

Ronald P. Weitzman, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Warren D. Bracy, Fletcher J. Campbell, Detroit, Mich., for defendants.

## OPINION

ANNA DIGGS TAYLOR, District Judge.

During the course of this trial each defendant moved the court to reconsider its previous denial of their pretrial motion to suppress evidence and oral statements which the government obtained as fruits of the airport stop and search. Based upon the new facts which have come to light during the course of trial of this matter, the motions to reconsider and to suppress will be and now are granted. As Judge Bazelon noted in *Rouse v. U. S.*, 359 F.2d 1014 (D.C.Cir., 1966), the court must be particularly sensitive to new matters when the government has engaged in a warrantless search of its citizens. This court endorses his statement that it is the duty of a trial judge to re-examine the issue of suppression, when previously undisclosed information is adduced at trial or the credibility of key witnesses is significantly called into question.

The subject of the drug courier profile and of airport stops has been considered

in a number of decisions within the Sixth Circuit as well as by the Supreme Court of the United States within the last few years. The courts have universally recognized the necessity for striking a balance between our societal interest in curtailing the sale of narcotics and their resulting destructive effects, and our equally strong interest in each individual's rights to personal security and freedom from the arbitrary intrusion of law enforcement officials. *U. S. v. Pope*, 561 F.2d 663 (6th Cir., 1977). Without reasonable and articulable facts upon which to base a suspicion that a citizen is engaged in criminal activity, a warrantless search or seizure is universally recognized as being constitutionally impermissible. Reliance merely upon the loosely defined characteristics known as the "drug courier profile" alone is not constitutionally sufficient to sustain a reasonable suspicion that criminal conduct is afoot. However, the profile's permissible components along with other relevant information known or observed by police officials may be considered to arrive at a reasonable suspicion of criminal conduct. *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890, 1980; *U. S. v. Smith*, 574 F.2d 882 (6th Cir., 1978).

The recent Supreme Court opinion in *U. S. v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, 1980 reviews the question of when the constitutional safeguards of the 4th Amendment are implicated by police stops. While Justices Stewart and Rehnquist conclude that not all personal approaches of police to citizens necessitate 4th Amendment scrutiny, they do not doubt that once a person's freedom of movement has been restrained by a show of authority, the standards enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and applied to the drug courier profile case must be demonstrated.

The threshold question presented in an airport stop case is whether the exchange between the law enforcement officials and the citizen constitutes a seizure. Based upon the totality of circumstances now on the record on this case, I find as a matter of fact that the defendants were seized when they were approached for questioning by the three Drug Enforcement Administration agents. A reasonable person in either Mr. Nembhard's or Mr. Wilson's position would have believed that they were not free to leave, despite the testimony of Special Agents Bryda, McCoy and Modesitt that no force or coercion was marshalled against the defendants. In arriving at this conclusion I have considered not only the number of officers present during the airport surveillance, and the later approach and seizure, but the credibility of the agents as tested by the more vigorous cross-examination of trial; and particularly by cross-examination against contradictory portions of the transcripts of their earlier testimony.

Detective-Sergeant Cleaves testified that he believed that Mr. Nembhard made furtive eye-contact with him several times during his walk from the jetway, through the concourse and into the airport restaurant. Although Cleaves and the other special agents attempted to avoid detection of their surveillance by Mr. Wilson or Mr. Nembhard each of five officers indicated that they believed the defendants were aware of their surveillance, based upon frequent eye-contact and gestures. Although only three officers actually ran to stop the defendants as they prepared to engage a taxi, it would have been completely reasonable for defendants to conclude that a larger force was present to meet with any resistance. After the officers displayed their credentials and informed Nembhard and Wilson that they were involved in the detection of narcotics trafficking, and wished to question them, the suspects were escorted back to the terminal, closely accompanied on all sides by DEA agents. The court notes that the questioning of defendant Wilson did not cease despite the fact that he produced a driver's license for identification in response to agent Modesitt. The license was not returned, but was kept by the agent. Mr. Nembhard stated that he had no identification, but he too was asked inside to be questioned further. It was apparent to this court, after listening to the testimony of the agents, that Nembhard and Wilson

would have been detained and formally arrested on the sidewalk by the officers regardless of their conduct or the answers they supplied once stopped. It was therefore reasonable for the defendants to have perceived the reality of their circumstances and to realize that they were not at liberty to ignore the requests and questions posed by the agents.

■ Having determined that a seizure took place once the defendants were stopped on the sidewalk, the court must assess whether the seizure was a product of reasonable and articulable facts which could logically support an inference of criminal behavior. While the training and experience of the law enforcement official is relevant to tally a sum total of information which might otherwise appear innocent, the constitutional standard may not be satisfied by inchoate and unparticularized suspicions, or a mere hunch. Unquestionably, racial stereotypes and prejudices may not be a component of the equation that any law enforcement officer relies upon to focus his suspicions of criminal conduct.

After listening to the testimony of Detective-Sergeant Paul Cleaves at trial, I find that impermissible racial considerations tainted his analysis of the defendants' conduct from the instant that he saw them. When asked by the court why his attention was drawn to Nembhard and Wilson and to no one else, Cleaves responded that he was immediately interested when he observed two gentlemen of the same race, similarly dressed, debarking from the first class section of a flight originating in New York City. Although hundreds of presumably innocent first class passengers land daily at Detroit Metropolitan Airport from New York City the Detective-Sergeant's suspicions were aroused because these two passengers were black. At the pretrial suppression hearing, all racial considerations had been denied by all present. In view of Sergeant Cleaves' revelation, the court concludes that his racial preconceptions colored his assessment of defendants' conduct, after drawing his attention to their presence. The subsequent behaviors which Cleaves described, that of Nembhard's "nervousness", of furtive eye-contact with the person following him, indicative of "scoping" for surveillance, and of walking at varying paces apart from each other through the terminal, is equally as compatible with innocent and normal conduct as it is indicative of criminal activity. Because Sergeant Cleaves grounded his most basic and fundamental conclusion that criminal activity was afoot upon a completely illogical and unfounded racial stereotype, this court concludes that the conduct which he testified that he later observed and reported to his fellow officers was not a reasonable ground upon which to bottom the decision to single out Mr. Nembhard and Mr. Wilson for approach.

I further find that each of the other law enforcement officers who observed the defendants and later prevented them from leaving the airport relied substantially upon the initial judgment of Sergeant Cleaves in arriving at their suspicion of criminal conduct. That was their testimony. In contrast to Sergeant Cleaves' conclusion that Nembhard and Wilson were attempting to hide the fact of their being together, Agents Dunn, Bryda, McCoy and Modesitt did not personally observe any conduct reflective of a surreptitious relationship. They watched the defendants lunch together. Agent McCoy, who joined Sergeant Cleaves as the defendants approached the restaurant, affirmatively stated that Nembhard and Wilson acknowledged each other before they entered the Innkeeper. Significantly, each of the Drug Enforcement Administration Agents who testified, stated from the witness stand that they very well may not have arrived at the decision to detain and question Nembhard and Wilson were it not for the characteristics of suspicious activity reported to them by Cleaves.

The court's original decision not to suppress the evidence seized at the airport was based substantially upon its assessment of Agent Modesitt's credibility. However, that conclusion was made prior to the revelation that Modesitt had falsely represented to the grand jury that he had personally observed *all* of the defendants' airport ac-

tivity; and that the only officer who observed "furtive" conduct had first become suspicious because two black individuals emerged from the first class section of an airplane. His conclusions and the conclusions of the other officers who relied upon his assessments do not rise to the level of a reasonable suspicion. Although Agent Modesitt testified that race was not a factor in his original observation of the defendants, his credibility has been substantially eroded. I find that the racial stereotype upon which Cleaves based his decision to follow the defendants thoroughly poisoned the judgment of the agents who eventually stopped and questioned Nembhard and Wilson. I can only conclude, therefore, that none of the agents possessed an untainted and reasonable suspicion that Mr. Wilson and Mr. Nembhard were engaged in criminal activity at the time they were seized on the sidewalk.

Having concluded that defendants were seized in violation of their 4th Amendment rights, this court must assess whether a valid consent to search their baggage was secured by the agents. The question of voluntariness of consent is one of fact to be determined from the totality of circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The government has the burden of proof in establishing that a consent following an illegal seizure is made unequivocally, without the contamination of duress or coercion. *Simmons v. Bomar*, 349 F.2d 365 (6th Cir., 1965). Upon examining the circumstances of the seizure, the number of agents involved, their varying testimony on the subject, and the manner in which the searches were executed, I conclude that any consent the defendants may have given was the product of duress, rather than intelligently or voluntarily made.

As stated earlier, after listening carefully to the trial testimony, this court is convinced that the defendants would not have been free to walk away from the officers regardless of their responses to questions posed. Consequently, the fact that Wilson and Nembhard accompanied the agents back to the terminal does not demonstrate voluntary cooperation on the defendants' behalf. Upon being told that the officers were drug enforcement agents it was reasonable for the defendants to conclude that each of them was armed, even if weapons were not brandished. After being escorted up a narrow corridor to the so-called "first aid room" the defendants were not only isolated from passers-by at the airport, but from one another as well. They were then scrutinized separately, each by two officers who could corroborate any version of the facts they might feel called upon to give. Indeed, they testified that their separation of and pairing-off with each defendant was for the purpose of corroboration. Under these circumstances, the government has failed to demonstrate that cooperation or consent was tendered which was not a direct product of duress and coercion. Thus I hold that the evidence which was uncovered at the airport, as well as any statements which the defendants then made, must be suppressed.

Therefore, the Motions to Suppress have been reconsidered and granted.