**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Edward NEMBHARD and James Wilson,
Defendants-Appellees.**

No. 81–1125.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 27, 1982.

Decided April 19, 1982.

194

Richard A. Rossman, U. S. Atty., Maura D. Corrigan, Detroit, Mich., Joel Shere, Southfield, Mich., for plaintiff-appellant.

Howard J. Diller, Domenick Porco, New York City, for defendants-appellees.

Before BROWN and KENNEDY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

BAILEY BROWN, Circuit Judge.

Appellees, Edward Nembhard and James Wilson, were arrested in Detroit Metropolitan Airport shortly after they deplaned from a flight from New York City when heroin was found in the luggage that Wilson was carrying. After they were indicted on four counts for possession of heroin with intent to distribute[1] and aiding and abetting each other,[2] the district judge heard and overruled their motion to suppress the evidence.

The case then went to trial. The testimony of the drug enforcement officer who had testified before the grand jury was supplied to the court and defense counsel, and it developed at the trial that part of this grand jury testimony was hearsay. The district judge then took under advisement defendants' motion to dismiss the indictment on the ground that the grand jury had been misled. Further, during the trial, defendants reasserted their motion to suppress on the ground that, they contended,

the trial testimony showed that one of the officers who participated in the surveillance and arrest of defendants, in making his decision to approach and question them, in part relied upon the fact that defendants are black. The district judge also took this motion under advisement. The defendants were found guilty by the jury on all counts.

On the day the guilty verdicts were returned, the district judge filed an order, supported by two separate memoranda, granting the motions to suppress and to dismiss the indictment and setting aside the guilty verdicts. *United States v. Nembhard*, 512 F.Supp. 15 and 19 (D.C.E.D. Mich.1980). She determined that the conduct of the government and its witness before the grand jury in misleading the grand jury as to the hearsay nature of part of the testimony was so egregious as to require, in the exercise of supervisory capacity, a dismissal of the indictment. The district judge further determined that one of the surveillance officers had relied on inappropriate "racial stereotypes," that this reliance also tainted the decisions of all the officers who participated in the surveillance and questioning of the defendants, and that therefore the evidence must be suppressed.

The government then brought the instant appeal of the district court's decision suppressing the evidence and dismissing the indictment. We conclude that the record does not reflect a legitimate basis for dismissing the indictment. We further conclude that the district judge was correct in denying the motion to suppress prior to the trial and that the evidence adduced at the trial was not an adequate basis to change her decision. Accordingly, we vacate the order suppressing the evidence, dismissing the indictment and setting aside the guilty verdicts and remand for reinstatement of the indictment and the guilty verdicts and for entry of judgments of conviction.

I.

On April 21, 1980, Detective Sergeant Paul Cleaves of the Michigan State Police

---

**1.** 21 U.S.C. § 841(a)(1) (1976).

**2.** 18 U.S.C. § 2(a) (1976).

and Special Agent William Modesitt of the Drug Enforcement Administration (DEA) were observing deplaning passengers at Detroit Metropolitan Airport from an American Airlines flight from New York City, a source city for white heroin. Edward Nembhard and James Wilson were the first two passengers to deplane, Nembhard carrying a tan vinyl suitcase and Wilson carrying a black briefcase. Nembhard, who was in the lead, appeared to be in a hurry, and nervously scanned the deplaning area as if he were looking for someone. The two men did not walk together or speak to each other, and appeared not to know each other.

Both men walked to a bank of telephones near the deplaning lounge, made telephone calls while looking back in the agents' direction, and hung up at about the same time. Agent Modesitt left the lounge area to follow another passenger, a young white woman, before the termination of the phone calls, and Cleaves was left to continue the surveillance. Wilson hung up the telephone and began walking slowly toward the concourse. Nembhard also hung up his telephone, breezed past Wilson, and began walking up the concourse, staying about ten to twenty feet ahead of Wilson, who quickened his pace when Nembhard passed him. Nembhard constantly looked back toward the trailing agent as he continued up the concourse and slowed down periodically, allowing Wilson to catch up. The lead changed at one point, with Wilson passing Nembhard, but Nembhard regained the lead and eventually a sizeable interval between the two men emerged. Nembhard then stopped at a bank of telephones near the airport restaurant, and dialed a number without apparently depositing any money in the telephone. Nembhard hung up when Wilson caught up with him, and they began conversing as they entered the restaurant together. Wilson and Nembhard had not spoken to each other at any time during their journey down the concourse nor acknowledged each other's presence until this point.

His suspicions fully aroused, Cleaves called for assistance and he was eventually joined by Agents Bruce Bryda, Robert Dunn and Richard McCoy. Agent Modesitt also rejoined the surveillance at the restaurant. Wilson and Nembhard spent about thirty-five minutes in the restaurant, sitting at the same table and conversing. Nembhard stared at Cleaves several times as Cleaves, seated at the bar, glanced in their direction. When the suspects exited the restaurant, the agents noticed that they had exchanged their luggage, Wilson now carrying the tan vinyl luggage and Nembhard the black briefcase. Nembhard paced up and down waiting for Wilson to finish a phone call he made upon leaving the restaurant. They then walked together at a normal pace through the north terminal.

When they reached the end of the concourse, Nembhard glanced back down the concourse, then both men scurried down an escalator, through the baggage claim area for United Airlines (although their flight had been on American Airlines), and left the terminal. As they headed for a taxicab, three of the agents, who had used another exit, approached them. Agent Modesitt, addressing Wilson, identified himself as a police officer, showed Wilson his badge, and asked if Wilson would step aside out of the path of traffic from the terminal exit to answer some questions, which Wilson assented to do. Modesitt then asked if he could see Wilson's airline ticket and some identification. Wilson, his hands shaking, produced a New York driver's license with his proper identification, but claimed he had no airline ticket, contending that he had been in Detroit for two days visiting friends. He also denied knowing Nembhard, claiming they had never met.

Agents Bryda and McCoy simultaneously approached Nembhard, who also stepped off to the side of the terminal exit. In response to Agent Bryda's inquiries, Nembhard claimed he had neither identification nor an airline ticket but stated that his name was Edward Nembhard. He at first claimed that he did not know Wilson, but when challenged by the agents' recitation of his restaurant rendezvous with Wilson, Nembhard maintained that they had met on

the airplane. When asked to accompany the agents to the first aid office inside the terminal for further questioning, both Wilson and Nembhard agreed to do so.

At the first aid room about thirty-five yards away, Modesitt and Wilson waited in the hall for several minutes while the other agents spoke to Nembhard. Nembhard's briefcase was searched with Nembhard's consent, but nothing illicit was discovered, although it contained papers belonging to Wilson. After Nembhard was thanked for his cooperation and left the room, Wilson and Modesitt entered the room. Agent Modesitt advised Wilson that he was a federal narcotics agent, said he was looking for narcotics coming into the airport, and told Wilson he believed Wilson could be carrying narcotics. Wilson did not respond. Modesitt asked for Wilson's consent to search his luggage and person; Wilson was advised of his right to refuse. Wilson told Modesitt he could search the suitcase but denied it was his luggage and claimed he was paid to carry it. Modesitt opened the suitcase, seized approximately ten ounces of 67% pure heroin, and placed defendants under arrest.

Agent Modesitt was the only witness who testified before the grand jury as to the events leading up to the search and arrest. The United States Attorney elicited Modesitt's explanation that he and Detective Sergeant Cleaves had met the New York City flight and initially began observing the defendants' activities. The queries concerning defendants' behavior were framed in terms of what "you" observed. Modesitt responded with details of what "we" and "us" observed and thought. The United States Attorney did not seek further clarification of who "we" and "us" constituted. Consequently, the grand jury was never informed that Modesitt's personal observations were temporarily discontinued when he briefly instituted surveillance of another deplaning passenger while defendants were both engaged in their initial telephone calls and that Modesitt's personal knowledge of defendants' activities did not resume until he rejoined the surveillance team at the restaurant. When Modesitt's grand jury

testimony was challenged at trial, he explained that he knew hearsay evidence was admissible before the grand jury, and he followed his regular procedure of merely describing the activities of the entire surveillance team without differentiating between personal observations and the reports of other agents.

Defendants made a motion to suppress evidence obtained from an alleged illegal search, which was entertained in August of 1980. The district court denied the motion, finding that Modesitt and the other agents "clearly had a reasonable and articulable suspicion that Defendants were carrying narcotics, after approximately an hour of observation." The district judge enumerated the following facts which substantiated her finding that the "seizure" of the defendants was reasonable:

First, the agents saw Defendants debark from the plane from New York City, a known source of white heroin in the midwest. Second, they emerged nervously, "scoping out"; or surveying the persons in the concourse in a more furtive manner than normal travelers. Third, they emerged first from the plane, as is a known habit of couriers, to quickly dissolve into the crowd, if they do not sit to emerge last .... Fourth, they had checked no luggage, but had kept carry-on pieces in their possession. Fifth, they clearly attempted to conceal their togetherness, through the concourse. Sixth, they exchanged possession of their respective pieces of luggage, at the airport restaurant. Seventh, they went to two separate phones to place calls on at least two occasions, but appeared not to really have conversations. And possibly to use those occasions to further "scope out" the position of the agents who were following them. Eighth, Mr. Nembhard, the obvious leader through their airport peregrinations for almost an hour, continually looked back at the following crowd and made eye contact with the agents on numerous occasions. Nine, after an hour of dawdling, as defendants rounded the last mile of the concourse into the home

stretch to the escalator, Nembhard looked back one last time at the agents, and then, after turning the corner, speeded up the pace, moved quickly down the escalator, and out to the cab stand.

Appendix at 181. The district court further concluded that Nembhard gave clear and uncoerced consent to a search, and that Wilson also gave valid consent to the search of his suitcase. The district court stated that the only pressure on Wilson was from Nembhard's prior cooperation, not from any coercive actions of the government agents.

The defendants renewed their motion to suppress the evidence and also moved to dismiss the indictment after the trial commenced. The district court held the motions in abeyance pending the jury's verdict. The jury found both defendants guilty as charged on December 4, 1980. That same day, the district court granted the motion to suppress and also dismissed the indictment. The district court filed separate memorandum opinions stating its reasons for its abrupt change of position. *United States v. Nembhard*, 512 F.Supp. 15 and 19 (D.C.E.D. Mich.1980).

After having heard Cleaves's testimony at trial, the district court concluded:

> Sergeant Cleaves grounded his most basic and fundamental conclusion that criminal activity was afoot upon a completely illogical and unfounded racial stereotype, [therefore] this court concludes that the conduct which he testified that he later observed and reported to his fellow officers was not a reasonable ground upon which to bottom the decision to single out Mr. Nembhard and Mr. Wilson for approach.

*Id.* at 18.

The district court's conclusion was based on the following cross examination testimony of Cleaves at the trial:

Q [By Mr. Campbell, Attorney for Nembhard] I see. Now, sir, back—going to the point where you indicated where you were back at the gate with Mr. Modesitt and you are observing the arrival of Flight 455—455, is that correct?

A To my knowledge, that's correct.

Q And the first person—the first two people that came out the door were two black males, Mr. Wilson and Mr. Nembhart?

A That's correct.

Q And you immediately became suspicious of them, is that correct?

A We observed them from—immediately start observing the two—

Q I want to know if you became suspicious of them?

A No.

 \* \* \* \* \* \*

Q So you picked up the first two black males off the plane?

A We picked out—

Q Not we, you?

A Yes, sir.

 \* \* \* \* \* \*

THE COURT: What attracted your attention immediately?

THE WITNESS: They are two gentlemen from New York. They're dressed, apparently alike. They're dressed similarly. They are both of the same race. They both were walking in the same direction. They both went to the telephone. They both appeared to make telephone calls. They both did not converse to each other, but were walking in the same vicinity of each other.

THE COURT: So you were suspicious of them before they had moved from this rampway towards the terminal, really?

THE WITNESS: I was interested in them at that point, your Honor.

THE COURT: As soon as you saw them?

THE WITNESS: Yes.

Q (By Mr. Campbell) So you are interested in black males coming from New York?

A I was interested in these two black males coming from New York.

Appendix at 206–08.

The district court further concluded that the judgment of the other agents except for Modesitt was tainted by Cleaves's unwarranted suspicions, since they in part relied

upon Cleaves's initial observations of the defendants' incongruous behavior down the concourse to the restaurant for their suspicions. The district court finally found that "[a]lthough Agent Modesitt testified that race was not a factor in his original observation of the defendants, his credibility has been substantially eroded" because "Modesitt had falsely represented to the grand jury that he had personally observed *all* of the defendants' airport activity . . . ." 512 F.Supp. at 18–19. In conclusion, the district court determined that the agents did not have a reasonable suspicion that Wilson and Nembhard were engaged in criminal activity, and therefore the two defendants were illegally "seized." The district court also concluded that the consent given to the search of Wilson's suitcase following the illegal seizure was a result of duress; consequently, the district court suppressed the evidence obtained from that search. *Id.* at 19.

In its second opinion, *United States v. Nembhard*, 512 F.Supp. 19 (D.C.E.D.Mich. 1980), the district court concluded that Modesitt's grand jury testimony, found to be deliberately misleading, was "an abuse of the grand jury system so egregious as to warrant intervention by the use of the court's supervisory powers." *Id.* at 23, quoting *United States v. Barone*, 584 F.2d 118, 125 (6th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1019, 59 L.Ed.2d 73 (1979). Because the government's course of action "made a mockery of the judicial process," 512 F.Supp. at 23, quoting *United States v. Barone, supra* at 127 (Keith, J., dissenting), the district court dismissed the indictment against the defendants.

## II.

 In *United States v. Barone, supra,* the United States had presented ten live witnesses before a grand jury for the United States District Court for the Southern District of Ohio in an effort to indict Barone. The grand jury returned a "no true bill." Subsequently, the matter was presented to a second grand jury empaneled by the United States District Court for the

Eastern District of Kentucky, which returned an indictment on the strength of the testimony of only one witness, a DEA agent. Barone conceded on appeal that a valid criminal indictment could be based solely on hearsay evidence, *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); nevertheless, he contended that "it was unfair to seek and obtain through the hearsay evidence of one federal agent what could not be obtained through the direct testimony of ten eyewitnesses." *Barone, supra* at 125. This court rejected Barone's contentions, and specifically declined to follow the Second Circuit case of *United States v. Estepa*, 471 F.2d 1132 (2nd Cir. 1972), which held that a court's supervisory powers to dismiss an indictment could be utilized where improper and misleading hearsay testimony was used to procure the indictment. This court stated:

> In conclusion, while we do not foreclose the possibility of an abuse of the grand jury system so egregious as to warrant intervention by the use of our supervisory powers, such a circumstance clearly does not exist here, and we are not inclined to adopt the position of the Second Circuit in *Estepa.*

*Barone, supra* at 125.

Despite this court's specific rejection of the *Estepa* rationale in *Barone*, the district court, citing and discussing both opinions, dismissed the indictment against Nembhard and Wilson because of the "egregious" nature of Agent Modesitt's "deliberate" concealment of the hearsay nature of part of his grand jury testimony. In doing so, the district court abused its discretion.

The courts have repeatedly urged a sparing use of supervisory powers for deterrence purposes by dismissing the indictment and only on a showing of demonstrated and longstanding prosecutorial misconduct. *United States v. Artuso*, 618 F.2d 192, 196–97 (2nd Cir.), *cert. denied*, 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980) (same circuit as *Estepa*); *United States v. Fields*, 592 F.2d 638 (2nd Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *United States v. Owen*, 580 F.2d 365

(9th Cir. 1978). The Second Circuit has stated:

> There is simply no need to thwart the public interest in prosecuting serious crimes unless the government misconduct is widespread or extraordinarily serious. This was not the case here, and therefore it was an abuse of discretion to dismiss the indictment.

*United States v. Broward*, 594 F.2d 345, 351 (2nd Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979). There is no showing in this record that prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in this district.

The Supreme Court recently concluded that because of the strong public interest in prosecuting serious crimes, prejudice to the defendant must be shown before dismissal of an indictment would be warranted when the government has interfered with a defendant's Sixth Amendment right to counsel. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). The Tenth Circuit in *United States v. Drake*, 655 F.2d 1025 (10th Cir. 1981), extended the *Morrison* rationale to require that actual undermining of a fair trial must also be demonstrated when a federal court uses its supervisory powers rather than a constitutional basis to dismiss an indictment for prosecutorial misconduct. There was no showing of an iota of prejudice to either Nembhard or Wilson by Modesitt's grand jury testimony, since his summary of the surveillance activities accurately reflected the events as they unfolded, and the hearsay testimony, which was essentially background information, was immaterial to the grand jury's determination that there was

probable cause to believe that the defendants had committed a crime.[3] Therefore, the district court's extreme sanction of dismissing the indictment was clearly unwarranted.[4]

### III.

█ The district court's decision to reverse its position post-verdict and grant defendants' motion to suppress the evidence was based on three factors: (1) Cleaves's testimony was discounted because, the district court concluded, his initial suspicions were aroused partially because Wilson and Nembhard were black and thus his suspicions were racially motivated; (2) such impermissible use of race as a basis of suspicion tainted the observations of the other surveillance agents except for Modesitt, since the other agents did not personally observe suspicious activities creating an articulable suspicion independent of Cleaves's racially-biased surveillance; and (3) Modesitt's suspicions were discredited because his credibility was compromised by his "deliberately misleading" testimony before the grand jury. We conclude that the district court abused its discretion because it had an insufficient basis for ignoring its initial findings of fact and made an evidentiary ruling that was not supported by those initial findings.

The district court was unwarranted in inferring that Cleaves utilized an impermissible racial stereotype as the motivation for his initial suspicion of defendants' behavior. Cleaves's testimony falls far short of suggesting that persons of other races with similar conduct would not also have been investigated, and the district court's con-

---

**3.** *See United States v. Cathey*, 591 F.2d 268, 272–73 (5th Cir. 1979).

**4.** The United States also argues that the district court was clearly erroneous in determining that Agent Modesitt deliberately misled the grand jury (i.e., committed perjury), in concealing the hearsay nature of portions of his testimony. Since Modesitt was never expressly asked who observed the defendants after they left the deplaning lounge and Modesitt also offered the plausible explanation that he knew hearsay evidence was admissible before the grand jury and

did not believe he needed to distinguish between it and his personal observations, we are dubious about the district court's finding that Modesitt intentionally misled the grand jury. Nevertheless, we need not reach this issue because we conclude that the district court erred as a matter of law in using its supervisory powers to dismiss the indictment without showing prejudice to the defendants and long-standing misconduct before grand juries in this district.

cern that the surveillance was racially motivated is simply indefensible.[5] When considered in context, Cleaves's observation that Nembhard and Wilson, the first two individuals off the flight, were of the same race was just one of several factors indicating to Cleaves that the defendants were travelling together, and he became suspicious because they were trying to appear as if they were not together.

Furthermore, we find no basis for the court's conclusion that Cleaves's subsequent observations of the defendants were tainted by his use of the fact that they were of the same race as one of the criteria justifying a further inquiry. We do not think the district court was free to conclude on the basis of this evidence that Cleaves could not judge objectively whether appellees acted nervous, or tried to appear separate when in fact they were together, or appeared to talk on the phone when in fact they did not, independently of defendants' race.

If Cleaves's suspicions were not racially motivated, the suspicions of his colleagues of course were not tainted. Furthermore, even assuming that Cleaves's observations were properly discredited, we conclude that the district court was clearly erroneous in belatedly finding that "each of the other law enforcement officers who observed the defendants and later prevented them from leaving the airport relied substantially upon the initial judgment of Sergeant Cleaves in arriving at their suspicion of criminal conduct" and that "Agents Dunn, Bryda, McCoy and Modesitt did not personally observe any conduct reflective of a surreptitious relationship." 512 F.Supp. at 18. To the contrary, Agent McCoy, who was alerted by Modesitt that Cleaves was trailing two suspects off the New York City flight, joined Cleaves's surveillance while Wilson and Nembhard were still walking down the concourse, seemingly unaware of each other, and he witnessed Wilson first pass Nembhard, then observed Nembhard retake the lead, without either acknowledging the other's presence. McCoy's testimony corroborates Cleaves's observations and provides an independent basis for a reasonable suspicion of the defendants' elaborate concerted action of travelling in tandem down the concourse while remaining aloof from each other, at least to unsuspecting eyes, until they reached the restaurant, at which point they abandoned their pretense. Even without Cleaves's observations, there was more than sufficient independent evidence of surreptitious behavior to warrant suspicion of criminal conduct.[6]

Because there was no reasonable basis for the district court to disregard its initial findings on the suppression issue, we conclude that they should be reinstated and used to evaluate whether a reasonable suspicion of criminal conduct existed to justify the agents' interception of the defendants as they prepared to leave the airport.

The first issue is at which point the reasonableness standard of the Fourth Amendment should be applied. The district court on both occasions found "that the defendants were seized when they were approached for questioning by the three Drug Enforcement Administration agents." *Id.* at 17. The issue of when a seizure occurs in the context of an airport investigatory stop has been the subject of an intense debate in the federal courts, including this circuit and the Supreme Court.[7] However, since a res-

---

**5.** Appellees' counsel at oral argument conceded that the district court's racial consideration was not defensible.

**6.** Although we are doubtful that the district court was justified in discrediting Modesitt's testimony of the defendants' activities, we need not reach the issue whether the district court was clearly erroneous in questioning his credibility in light of our conclusions about the testimony of Cleaves and the other agents.

**7.** Attempts to resolve this issue have only muddied the waters of search and seizure jurisprudence. In *Mendenhall v. United States*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), only two members of the majority, Justices Stewart and Rehnquist, explored the issue of whether a seizure occurred. They determined that a federal narcotics agent may approach an individual in an airport, identify himself as a police officer, and question the suspect without Fourth Amendment considerations coming into play, and concluded that a seizure occurs when a reasonable person believes he is not free to

olution of that issue is not critical to the disposition of this case, we shall assume for purposes of argument that the district court was correct in its finding that a seizure occurred when Wilson and Nembhard were initially approached and that Fourth Amendment considerations came into play at that time.

■ It is well established that the standard by which the reasonableness of the agents' initial approach of Nembhard and Wilson is measured is their ability to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). *See also, Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). "While the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam). The evaluation of the reasonableness of the agents' interception of defendants is a conclusion of law examined independently by an appellate court. *See, e.g., id.* at 441, 100 S.Ct. at 2754; *United States v. Mendenhall,* 446 U.S. 544, 565 n. 5, 100 S.Ct. 1870, 1875 n. 5,

64 L.Ed.2d 497 (1980) (Powell, J., concurring); *United States v. Bowles,* 625 F.2d 526, 533 n. 7 (5th Cir. 1980).

■ It is our conclusion that the DEA agents articulated specific objective facts justifying the investigatory stop of Nembhard and Wilson as reasonable under the circumstances. "The reasonableness of seizures that are less intrusive than a traditional arrest, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Brown v. Texas, supra,* 443 U.S. at 50, 99 S.Ct. at 2640 (citations deleted), quoting *United States v. Brignoni-Ponce, supra,* 442 U.S. at 878, 95 S.Ct. at 2578. An "assessment of the whole picture" must be made from the specialized viewpoint of the law enforcement officers. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *United States v. Mendenhall, supra,* 446 U.S. at 561, 100 S.Ct. at 1881 (Powell, J., concurring). One of the major factors to be considered for the reasonableness of an investigatory stop is the relative intrusiveness of the investigatory stop. *Id.*

With regard to the agents' initial approach, the instant case, unlike *Reid* and *United States v. Jefferson,* 650 F.2d 854 (6th Cir. 1981), presents objective facts that sufficiently support the agents' reasonable inference that defendants were engaged in criminal activity, thus warranting a brief investigatory stop for questioning. In *Reid,* DEA agents depended on the drug courier profile, an "informal compilation of charac-

---

leave when stopped for questioning. *Id.* at 553–54, 100 S.Ct. at 1876–77. The three concurring justices, as well as the dissenting justices, declined to address the seizure issue because it was not raised below and therefore they assumed that Mendenhall was seized when she was approached for questioning by DEA agents. *See, e.g., id.* at 560, 100 S.Ct. at 1880 (Powell, J., concurring) and 570–71, 100 S.Ct. at 1885–86 (White, J., dissenting). In *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), decided one month after *Mendenhall,* the Court similarly assumed for purposes of argument that a seizure had been effected when a suspected drug courier was stopped and questioned at the Atlanta Airport.

This court has also considered the seizure issue post-*Mendenhall.* In *United States v. Jefferson,* 650 F.2d 854 (6th Cir. 1981), this court determined that even if Justice Stewart's *Mendenhall* analysis was accepted, a seizure occurred in *Jefferson* because the suspected drug courier was stopped and immediately asked to accompany the DEA agent to the baggage claims office without any initial questioning taking place; therefore, Jefferson could not reasonably have believed he was free to leave. This circuit has not addressed the issue whether a seizure occurs when a suspect is initially approached if, as occurred in the instant case, an interval exists between the initial contact and a subsequent move to another location for further questioning.

teristics believed to be typical of persons unlawfully carrying narcotics" to justify an airport investigatory stop. *Reid, supra,* 448 U.S. at 440, 100 S.Ct. at 2753. The Supreme Court determined that Reid's arrival from a source city in the early morning with only carry-on luggage, which corresponded with some profile characteristics, "describe[s] a very large category of presumably innocent travelers," and therefore was insufficient by itself to justify a suspicion of criminal activity. *Id.* at 441, 100 S.Ct. at 2754. The Court further concluded that "the fact that [Reid] preceded another person and occasionally looked backward at him as they proceeded through the concourse" did not support a "fair inference" that Reid and his companion "were attempting to conceal the fact that they were travelling together," but instead was a mere "hunch." *Id.*

In *Jefferson,* this court sought to harmonize *Reid* and *Mendenhall* in this fashion:

The conflicting results in *Reid* and *Mendenhall* are explained by the differences in the relevant facts. In *Mendenhall,* the defendant engaged in conduct for which there was no reasonable explanation except as an attempt to avoid detection while smuggling drugs. She took great pains to observe any possible agents in the airport, she walked to the luggage area in the terminal without apparent reason, and she changed her airline ticket en route. By contrast, in *Reid,* actions of the defendant were not unreasonable or suspicious in themselves.

650 F.2d at 857. Accordingly, this court concluded that the agents who intercepted Jefferson at the Detroit Airport did not have

a reasonable suspicion that Jefferson was a drug courier:

The fact that Jefferson walked quickly in the terminal, arrived from Los Angeles, and did not pick up his luggage until someone arrived to pick him up at the airport, are not sufficient to create a well-founded suspicion. None of these actions are suspicious in themselves, nor are they suspicious when all are taken together.

*Id.*

■ On the contrary, here the aggregate of facts as initially determined by the district judge did warrant a reasonable inference that defendants were engaged in criminal activity. Unlike *Reid,* the instant case involves more than just profile characteristics unsupported by other articulable facts. The agents here had more than a mere "hunch" that defendants were attempting to conceal the fact that they were travelling together; their aloof yet concerted in-tandem conduct warranted a reasonable inference that they were in fact hoping to conceal their association. Such surreptitious conduct has been found to support a reasonable suspicion of criminal behavior in the airport surveillance context. *United States v. Bowles, supra* at 534–35 & n.11; *United States v. Vasquez,* 612 F.2d 1338, 1342–43 (2nd Cir. 1979), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). Defendants' arrival from a source city for heroin,[8] the exchange of luggage, Nembhard's nervousness at various stages of the surveillance,[9] the defendants' scrutiny of the lounge area,[10] Nembhard's periodic glancing over his shoulder at the receding concourse for evidence of surveillance,[11] defendants' "staring" at the agents,[12] use of simulated telephone calls to afford opportu-

---

**8.** While *Reid* discounted reliance solely on drug courier profile characteristics, this does not mean that arrival from a source city along with other characteristics in the drug courier profile cannot be included in the *totality* of circumstances justifying an investigatory stop. *Accord, United States v. Berry,* 670 F.2d 583, 600–601 (5th Cir. 1982) (en banc).

**9.** *See id.* at 603.

**10.** *See Mendenhall, supra,* 446 U.S. at 564, 100 S.Ct. at 1882 (Powell, J., concurring); *United States v. Forero-Rincon,* 626 F.2d 218, 222 (2nd Cir. 1980).

**11.** *See United States v. Viegas,* 639 F.2d 42, 45 n.5 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981).

**12.** *See United States v. Berry, supra.*

nities for "scoping" out hazardous areas,[13] and defendants' evasive attempt to quickly slip out of the airport, when considered together, were more than sufficient to create a well-founded suspicion of criminal behavior.

The initial intrusion into the defendants' liberty interests was slight, involving only a few minutes of defendants' time in a public place to answer routine questions about their identity and their activities. Although defendants were asked to step aside out of the path of other exiting patrons, this was a reasonable request to avoid inconvenience and embarrassment to the defendants. The reasonableness of the entire initial stage of questioning is undeniable. *See, e.g., United States v. Viegas,* 639 F.2d 42, 45 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981); *United States v. Forero-Rincon,* 626 F.2d 218, 224 (2nd Cir. 1980).

Furthermore, the additional information received by the agents during the minimally intrusive initial stage of questioning "provided a quantum leap to the 'articulable facts' known" by the agents. *United States v. Berd,* 634 F.2d 979, 986 (5th Cir. 1981). When Wilson lied about having been in Detroit for two days, Nembhard denied having identification or a ticket, and both defendants denied knowing each other when surveillance had indicated an intimate association resulting in the exchange of carry-on luggage, a request to retire to the terminal for additional questioning, although involving a more significant intrusion, was entirely justified under the circumstances.[14] Even if the questioning of the defendants is considered a custodial interrogation amounting to the essential equivalent of an arrest, *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), *United States v. Blum,* 614 F.2d 537 (6th Cir. 1980), we conclude that the circumstances gave rise to probable cause for continued detention for additional questioning; therefore, we need not determine whether defendants' trip inside the terminal was voluntary or a result of coercion.

■ The district court also reversed its findings post-verdict about Wilson's consent to search the tan vinyl bag, stating that the presence of two agents for corroboration purposes during his separate questioning was coercive. Because we have already determined that Wilson was not unlawfully detained, his apparent consent to the search of the luggage was not infected by any unlawful detention. Furthermore, questioning by two agents, without further indication of duress, is not inherently coercive. Without any additional facts presented at trial warranting a conclusion that the district court's initial finding that Wilson consented to the search was incorrect, we must conclude that the district court's post-verdict finding of duress was without any basis in fact; therefore, the court's original finding of voluntariness must be reinstated.[15] We further conclude that the warning Wilson received that he need not consent to the search, along with the other circumstances, sustained the district court's original determination that consent was voluntarily given. See *Mendenhall, supra,* 446 U.S. at 558–60, 100 S.Ct. at 1879–80 (Court's opinion on consent issue concurred in by all five members of the majority).

Since the district court erred in dismissing the indictment and suppressing the evidence and setting aside the guilty verdicts and since these actions were taken subsequent to valid jury verdicts of guilty, this order of the district court is vacated, and the case is remanded for reinstatement of the indictment and the guilty verdicts and for entry of judgments of conviction.

---

**13.** *See United States v. Viegas, supra,* at 43 & 45 n.5.

**14.** *See United States v. Herbst,* 641 F.2d 1161, 1167–68 (5th Cir. 1981); *United States v. Berd, supra* at 986.

**15.** The United States has urged on appeal that the defendants had no standing to challenge the search of the tan vinyl bag, since neither defendant asserted an interest in the bag. However, we do not reach this issue, since it was not raised before the district court.