82 F.3d 419
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John George LABBOUS (94-6169), Randy Lee Ingram (94-6181)
Defendants-Appellants.
 Nos. 94-6169, 94-6181.
 United States Court of Appeals, Sixth Circuit.
 April 8, 1996.
 
 Before: JONES, BOGGS, Circuit Judges, and COFFMAN, District Judge.*
 PER CURIAM.
 
 
 1
 Defendants appeal their jury convictions and sentences for conspiracy, theft from interstate shipment, and other crimes relating to interstate transportation of stolen tires. For the following reasons, we affirm.
 
 
 2
 * Defendants, John George Labbous and Randy Lee Ingram, were two of seven individuals charged in an indictment returned by the grand jury for the United States District Court for the Middle District of Tennessee, Nashville Division. At the commencement of the scheduled trial for all defendants, January 4, 1994, the district court granted Randy Ingram a severance upon his motion and scheduled his trial for April 5, 1994. Six days into the trial, Labbous was granted a mistrial, and his new trial was scheduled for April 5, 1994, to be held along with Randy Ingram's trial. The mistrial was granted due to a faulty in-court identification.
 
 
 3
 The same grand jury returned a superseding indictment on February 4, 1994, charging Labbous and Randy Ingram with the same crimes charged in the original indictment. Labbous moved to dismiss the indictment on the grounds of double jeopardy. The motion was denied.
 
 
 4
 As scheduled, trial for both Defendants began on April 5, 1994. The court denied Randy Ingram's pretrial Motion to Suppress In-Court Identifications. During the course of the trial, the Defendants made a series of motions and objections--motions to dismiss the indictment, motions for mistrial, motions to suppress evidence, and objections to various proffered evidence and testimony--which the court denied. Defendants claim the court's denial of the motions and objections was error.
 
 
 5
 The jury convicted the Defendants on May 2, 1994. The court held a joint sentencing hearing for all convicted co-conspirators to determine the value of the stolen tires, trailers, and tractors, for the purpose of calculating the offense level under the Sentencing Guidelines. The court chose to apply the retail value of the property taken during the conspiracy to determine sentences. During the individual sentencing hearing for Randy Ingram, the district court specifically found that he committed perjury, and as a result, increased his offense level by two levels.
 
 
 6
 On July 28, 1994, the district court denied Defendants' Motions for New Trial. Both Labbous and Ingram were sentenced to 48 months in prison on July 29, 1994. They appeal, challenging their convictions and the sentences imposed by the district court.
 
 II
 
 7
 Collectively, Defendants have presented the court with a myriad of separate issues. In addition to those we specifically address below, we have carefully considered other issues and are convinced that they are without merit. We will now address those which we deem worthy of some discussion.
 
 
 8
 A. Dismissal of the Indictment Based on False Testimony
 
 
 9
 The Defendants argue that Agent Dickey provided false and misleading statements to the grand jury, that the government, knowing they were false, did nothing to disclose their falsity, and that as a result, the grand jury process was tainted. Accordingly, Defendants assert the district court erred in not dismissing the indictment or providing a new trial.
 
 
 10
 We review a district court's refusal to dismiss an indictment or grant a new trial for abuse of discretion. United States v. Overmyer, 899 F.2d 457, 465 (6th Cir.), cert. denied, 498 U.S. 939 (1990). "[A] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988). Further, in the Sixth Circuit, "the law is clear that a court may not order dismissal of an indictment under its supervisory power unless the defendant demonstrates that 'prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in [the] district.' " United States v. Griffith, 756 F.2d 1244, 1249 (6th Cir.), (citing United States v. Nembhard, 676 F.2d 193, 199 (6th Cir.1982)), cert. denied, 474 U.S. 837 (1985). Finally, as long as there is "some competent evidence to sustain the charge issued by the Grand Jury" an indictment will not be dismissed solely on the basis that other evidence presented to the grand jury may have been false or misleading. United States v. Adamo, 742 F.2d 927, 939 (6th Cir.1984).
 
 
 11
 In the instant case, the false testimony proffered by Agent Dickey--that co-conspirator Joe Ingram admitted being involved in six rather than three criminal acts--related to Joe Ingram's continuing participation in the conspiracy. It had no direct relevance to the Defendants' participation in the crimes. The Defendants claim that the testimony made it appear as if the government had a stronger case, in general, than it actually had. That argument is unpersuasive. This false testimony did not prejudice Defendants. Moreover, Joe Ingram testified in front of the same grand jury and explained his limited participation. To the extent Dickey's false testimony to the grand jury created any misconceptions, they were diminished by the testimony of Joe Ingram. Finally, there was no proof of a longstanding problem of prosecutorial misconduct in grand jury proceedings in this district. Hence, the district court did not abuse its discretion in denying Defendants' motions on this issue.
 
 
 12
 B. Due Process Violation/Alleged Government Use of Perjured Testimony
 
 
 13
 The Defendants allege that Joe Ingram offered false material testimony at trial concerning his continued participation in the conspiracy and his undisclosed "deals" with the government. They suggest the government knew his testimony was false and conclude that it tainted the jury's factfinding process and violated the Defendants' due process rights. The court, in denying the Defendants' motions to dismiss the indictment, motions for a new trial, motions for mistrial and motions to strike the testimony of Joe Ingram, found that there was no intentional prosecutorial misconduct and that Defendants' right to due process was not violated. Labbous J.A. at 560, 592, 595.
 
 
 14
 We review the denial of Defendants' motions for abuse of discretion. "The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir.1989) (citing United States v. Bagley, 473 U.S. 667, 678 (1985)). In Lochmondy, we implemented a three-prong test to establish prosecutorial misconduct or a denial of due process through the use of false or perjured testimony. The defendant must show: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. Lochmondy 890 F.2d at 822. "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." Id.
 
 
 15
 We do not need to address all the elements of this test. The alleged false testimony was not material. Further, given the magnitude of the evidence presented in this case, and the fact that Joe Ingram was tested on cross-examination, allowing the jury to see him, "warts and all," any misconduct in this instance was harmless error. The record reflects that the district court labored tirelessly, pondering the issues presented by this testimony, and that the court took almost every conceivable measure to diminish or negate the imnpact it may have had on the jury. The district court did not abuse its discretion.
 
 
 16
 C. Government Withholding of Giglio Material
 
 
 17
 The Defendants argue next that a new trial should have been granted because the government withheld Giglio material and the government engaged in a general practice of withholding discoverable evidence. Specifically, the withheld evidence was a document relating to Joe Ingram's conversations with government informants concerning the sale of stolen tires. The district court held that Defendants' right to a fair trial was not impaired because the court had cured any prejudice by allowing sufficient time and opportunity for the Defendants to explore, examine, and uncover the evidence.
 
 
 18
 Giglio material is impeachment material: material that is "evidence favorable to an accused ... so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." United States v. Bagley, 473 U.S. 667, 678 (1985). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' ... evidence affecting credibility [must be disclosed]." Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). No hard and fast rule exists, however, that the evidence must be disclosed before trial. "Any prejudice the defendant may suffer as a result of disclosure of the impeachment evidence during trial can be eliminated by the trial court ordering a recess in the proceedings in order to allow the defendant time to examine the material and decide how to use it." United States v. Presser, 844 F.2d 1275, 1283-84 (6th Cir.1988).
 
 
 19
 The court, consistent with the doctrines of this circuit and the Supreme Court, allowed the defendants abundant opportunity to review and use the evidence and did not abuse its discretion in denying a new trial.
 
 D. Jury Instructions
 
 20
 The Defendants allege that the jury instructions lump together criminal culpability for conspiracy, for aiding and abetting, and for the substantive offenses committed by co-conspirators in furtherance of the conspiracy, even though all conspirators did not participate in each such substantive offense, under the doctrine of Pinkerton v. United States, 328 U.S. 40 (1946), and thus were confusing, misleading and prejudicial. Specifically, Defendant Labbous explains he was not charged with all offenses and thus the instructions were extremely prejudicial to him.
 
 
 21
 Jury instructions are grounds for reversal only if the instructions, viewed in their entirety, were confusing, misleading or prejudicial. United States v. Milligan, 17 F.3d 177, 182 (6th Cir.), cert. denied, 115 S.Ct. 211 (1994). A Pinkerton charge, that all members of a conspiracy are responsible for acts committed by the other members, is appropriate even when the Defendant is charged with aiding and abetting. United States v. Lawson, 872 F.2d 179, 182 (6th Cir.), cert. denied, 493 U.S. 834 (1989). Contrary to the Defendants' arguments, the verdict form and the court's instructions clearly indicate that Labbous was never charged with nor was he required to defend against certain charges, and the instructions, taken as a whole, were not confusing and did not prejudice the Defendants. The district court painstakingly identified the potential problems with the charges and in delivering its instructions adequately distinguished between the crimes so as to minimize confusion. Further, the Pinkerton charge was appropriate even though Labbous was charged with aiding and abetting.
 
 E. Sentencing
 
 22
 The Defendants assert that the court applied the wrong method of calculation under U.S.S.G. § 2B1.1 to set their offense level. They suggest that the court should have used the wholesale rather than retail value in determining the fair market value of the stolen tires.
 
 
 23
 A proper valuation of a loss "is the fair market value of the particular property at issue." U.S.S.G. § 2B1.1, comment. (n. 2). It includes both harm to the victim and the gain of the defendant. "Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way...." Id. We addressed the "market value" issue in United States v. Warshawsky, 20 F.3d 204 (6th Cir.1994). In Warshawsky we ruled if an ascertainable market value is adequate to measure either harm to the victim, or gain to the defendant, such market value, whether retail, wholesale or other, should be determinative of loss. Warshawsky, 20 F.3d at 213.
 
 
 24
 The district court found there were two "readily ascertainable market alternatives"--retail value and wholesale value. Consequently, there was no need to go outside the guidelines to define a measure. Retail value was chosen as the adequate measure. This application was consistent with Warshawsky (where wholesale market value was deemed the proper measure of loss), even though the result was different. Although the tires were stolen from the wholesale stream of commerce, many were eventually offered for sale either in small quantities or to the general public as consumers. This amount, therefore, adequately represents what the Defendants would have attained through the criminal conspiracy.
 
 F. Double Jeopardy
 
 25
 Defendant Labbous claims that the mistrial granted on his motion at the January 1994 trial barred his retrial, on grounds that government agent misconduct was involved and jeopardy had attached. The government asserts that there was no misconduct on the part of any attorney or the court and that the conduct of the witness and the witness coordinator was inadvertent and not intended to cause the mistrial. The court, in awarding the mistrial, and later in denying Defendant Labbous' Motion to Dismiss the Indictment on double jeopardy grounds, found that the identification was inappropriate, but exonerated the government of any intentional misconduct.
 
 
 26
 It is well settled that a criminal defendant may not request a mistrial and thereafter lodge a double jeopardy complaint, unless it is shown that the conduct of the court or the government attorney which caused the mistrial was intended to do so. See Oregon v. Kennedy, 456 U.S. 667, 675-76 (1982). In this case, there was no conduct of the court or any attorney which caused the mistrial, much less intentional conduct. The Defendant makes a persuasive argument to extend the doctrine in Oregon beyond attorneys to all government employees. This court need not adopt that extension; through our de novo review we find that the district court was correct in concluding that the actions were not intended to cause a mistrial.
 
 G. In-Court Identifications
 
 27
 In addition to the adoption of Defendant Labbous' arguments, Defendant Randy Ingram contends that the circumstances surrounding his identification by both Officer Scissom and witness Brown was unnecessarily suggestive and violated his constitutional rights. Specifically, Defendant points to Scissom's one-on-one identification of Randy Ingram and Scissom's reproducing and keeping a copy of Randy Ingram's driver's license. With respect to Brown, Randy Ingram challenges the fact that pictures shown to Brown were "limited" and that it was not until six months after he had encountered Defendant that he positively identified Randy Ingram. The district court allowed the identifications and denied Randy Ingram's motion to suppress.
 
 
 28
 A district court's evidentiary ruling denying a defendant's motion to suppress identification must be upheld on appeal unless clearly erroneous. United States v. Lambert, 771 F.2d 83, 89 (6th Cir.), cert. denied, 474 U.S. 1034 (1985). If after evaluating the suggestiveness of pre-identification procedures, we determine them to be unduly suggestive, we apply a five prong reliability test set out in Neil v. Biggers, 409 U.S. 188 (1972). The five factors are:
 
 
 29
 the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
 
 
 30
 Id. at 199. The Sixth Circuit adopted this approach in United States v. Hill, 967 F.2d 226, 230-32 (6th Cir.), cert. denied, 113 S.Ct. 438 (1992).
 
 
 31
 When reviewing the admission of an in-court identification, "[e]ach case must be considered on its own facts." Hill, 967 F.2d at 667 (citing Simmons v. United States, 390 U.S. 377 (1968)). The district court was not clearly erroneous in its interpretation of the facts on this issue. The facts in this case simply are not impermissibly suggestive. Further, our de novo review uncovers no legal error. Therefore, the admission of the in-court identifications was appropriate.
 
 H. Improper Character Evidence
 
 32
 Next, Randy Ingram charges that two witnesses improperly made statements implicating him in drug use and supply and that such statements deprived him of a fair trial, warranting reversal of the conviction. Randy Ingram also asserts that curative instructions given by the court did more harm than good and should not have been given over his objection. The court refused to grant a mistrial.
 
 
 33
 In United States v. Forrest, 17 F.3d 916 (6th Cir.), cert. denied, 114 S.Ct. 2115 (1994), this court declined to overturn the district court's denial of a mistrial where inappropriate testimony about defendant's prior incarceration was "blurted out" by a government agent on both direct and cross-examination. Id. at 916. The court stated that the line of questioning was reasonable, a limiting instruction was given immediately, clearly, and forcefully, there was no evidence of bad faith by the government, and the reference was only "a small part of the evidence against defendant." Id. at 920. On the other hand, in United States v. Murray, 784 F.2d 188 (6th Cir.1986), this court reversed a conviction where a government agent deliberately gave testimony concerning a polygraph test. The court asserted that such a statement was highly prejudicial and that the curative instructions were construed as an attempt to "unring a bell." Murray, 784 F.2d at 189.
 
 
 34
 In today's age, the assertion that someone is a drug user or dealer carries with it an abhorrent connotation. We will not begin to presume the prejudicial effect that the statement that Ingram was a drug dealer may have had on the jury. Further, the court's insisting on a "curative" instruction, one which, by telling the jury to disregard Simpson's source of drugs, merely highlighted the fact that the implication was that Randy Ingram was the source of those drugs. Notwithstanding the possible prejudice, this evidence was only a small part of the testimony of those witnesses and an even smaller part of the trial. Based on other evidence, we find that Defendant Randy Ingram would nevertheless have been convicted. The statements were a minuscule part of the witnesses' entire testimony and there was no bad faith on the part of the government.
 
 I. Application of U.S.S.G. § 3C1.1
 
 35
 Defendant Randy Ingram asserts that the two-level increase, based on a finding that he lied about being stopped on Mounteagle Mountain by Officer Scissom, is not consistent with proper application of the sentencing guidelines. He asserts it was not relevant to any criminal act with which he was charged and thus is not obstruction of justice. Further, he alleges he is being penalized for testifying at his own trial. The court, in believing the testimony of Officer Scissom over Randy Ingram's, found that Randy Ingram's testimony about Mounteagle Mountain "constitute[d] a straight-forward, old fashioned plain lie" and that the "[s]traight-forward plain lie should not go unnoticed or unpunished." Ingram J.A. at 1842.
 
 
 36
 If an obstruction of justice enhancement is to be given for false testimony, the sentencing judge, who has the unique opportunity to judge credibility of witnesses, must make a clear finding that defendant has lied with respect to testimony given under oath. United States v. Burnette, 981 F.2d 874, 879 (6th Cir.1992). In this case, a justified finding was made and the enhancement, therefore, was proper.
 
 J. Bias
 
 37
 Finally, Defendant Randy Ingram's counsel asserts that the court "displayed hostility and disrespect for her in the presence of the jury." She suggests this bias permeated the trial and directly impacted on the court's evidentiary rulings and resulted in a trial that was manifestly unfair. The occasions that are challenged were mostly evidentiary hearings outside the earshot of the jury or efforts by the court at routine trial administration. Further, throughout the proceedings the court admonished all counsel at various points and it was not discriminating in severity. The court was not biased.
 
 III
 
 38
 We AFFIRM the Defendants' convictions and sentences.
 
 
 
 *
 The Honorable Jennifer B. Coffman, United States District Judge for the Eastern and Western Districts of Kentucky, sitting by designation