UNITED STATES of America,
Plaintiff-Appellee,

v.

Mario ADAMO, Richard Marsico, Terry Freeman, Raymond Ripley, Jeffrey Linkous, Ectore Garcia, and Winthrop Hong, Defendants-Appellants.

Nos. 82–3001 and 82–3009 to 82–3014.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 14, 1983.

Decided Aug. 22, 1984.

Leonard Yelsky (argued), Angelo F. Lonardo, Cleveland, Ohio, for defendant-appellant in No. 82–3001.

William E. Hunt (argued), Asst. U.S. Atty., Columbus, Ohio, for plaintiff-appellee.

Federick Jureck (argued), Cleveland, Ohio, for defendant-appellant in No. 82–3009.

Harold E. Wonnell (argued), Columbus, Ohio, for defendant-appellant in No. 82–3010.

Thomas M. Tyack & Associates Co. LPA (argued), Columbus, Ohio, for defendant-appellant in No. 82–3011.

David W. Douglas (argued), Columbus, Ohio, for defendant-appellant in No. 82–3012.

Francisco A. Garabis (argued), Columbus, Ohio, for defendant-appellant in No. 82–3013.

James K. Simakis (argued), Columbus, Ohio, for defendant-appellant in No. 82–3014.

Before JONES and WELLFORD, Circuit Judges, and MILES, District Judge.*

MILES, District Judge.

The present appeal arises out of a complex factual setting, yet poses legal questions which with one exception are neither novel nor unfamiliar. The Court has carefully scrutinized the entire record, and is quite familiar with all the facets of the prior proceedings. Because the analysis of each individual issue presented requires extended factual explanation, the usual detailed recitation of "facts" will not be indulged at the outset. Facts will be supplied throughout this opinion where such elaboration will be helpful in understanding the issues under consideration.

Pursuant to an investigation known as Operation Cufflink, a federal grand jury in the Southern District of Ohio, Eastern Division, returned a six count indictment in which ten defendants were named. The grand jury alleged in Count I that Richard Marsico, Ray Ripley, Jeffrey Linkous, Donald Voss, Dyana Kellner, Terry Freeman, Winthrop Hong, Ectore Garcia, Mario Adamo, David Calderwood, and "other persons known and unknown to the Grand Jury" engaged in a conspiracy in the Southern District of Ohio and elsewhere to unlawfully distribute cocaine and marijuana from on or about June 1976 to the date of the indictment, November 20, 1980. Richard Marsico and Jeffrey Linkous were charged in Count II with engaging in a continuing criminal enterprise in violation of Subchapter I of the Comprehensive Drug Abuse Prevention and Control Act of 1970 as codified at 21 U.S.C. § 848. Count III charged Donald Voss with distribution of cocaine, and Count IV similarly charged Donald Voss and Dyana Kellner with actual distribution of cocaine. Jeffrey Linkous and Richard Marsico were charged in Count V with traveling in interstate commerce to promote, manage, or carry on an unlawful activity, *i.e.,* a business enterprise involving the distribution of controlled substances in violation of 18 U.S.C. §§ 2 and 1952(a)(3). In the final count of the indictment, Count VI, Jeffrey Linkous was charged with traveling in foreign commerce with the intent to and actual distribution of the proceeds of an unlawful activity in violation of 18 U.S.C. § 1952(a)(1).

After a plethora of pretrial motions were filed by the parties, argued when necessary, and resolved by the trial judge, a trial was held which ultimately resulted in a mistrial for all participating defendants.[1] Defendants Mario Adamo, Ray Ripley, Richard Marsico, Jeffrey Linkous, Terry Freeman, Winthrop Hong, and Ectore Garcia were tried together in a second trial in July of 1981. At the conclusion of that trial, the jury convicted Adamo, Garcia, Hong, Freeman, and Ripley of the conspiracy alleged in Count I, convicted Marsico and Linkous of the offenses charged in Counts II and V, and convicted Linkous of the offense alleged in Count VI. All seven defendants have appealed their convictions.

## DISCUSSION

### I. Motions for Judgments of Acquittal

The seven appellants contend that the trial court erred in denying their motions

---

* Honorable Wendell A. Miles, Chief Judge, United States District Court for the Western District of Michigan, sitting by designation.

1. Defendants at the first trial were Mario Adamo, Richard Marsico, Jeffrey Linkous, Winthrop Hong, Ectore Garcia, Terry Freeman, and Ray Ripley. Dyana Kellner and Donald Voss were granted separate trials, but Voss subsequently pled guilty and the United States Attorney's office requested that the charges against Kellner be dropped. Calderwood was and apparently still is a fugitive. Freeman was severed from the other defendants during the first trial because of conflict of interest problems with his attorney, but was rejoined with the present appellants for the second trial. The first trial ended in a hung jury, and therefore a mistrial, for all defendants.

for directed verdicts or, more properly, motions for judgments of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. These motions were made at the conclusion of the government's case and were renewed prior to the Court instructing the jury.

■■■ It is well established that a trial judge confronted with a Rule 29 motion must consider all of the evidence in a light most favorable to the government and grant the motion when it appears to the Court that the evidence is insufficient to sustain a conviction, *e.g., Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Brim,* 630 F.2d 1307, 1311 (8th Cir.1980), *cert. denied,* 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981); *United States v. Green,* 548 F.2d 1261, 1266 (6th Cir.1977); *United States v. Gaines,* 353 F.2d 276, 278 (6th Cir.1965). The government must be given the benefit of all inferences which can reasonably be drawn from the evidence, *Glasser v. United States,* 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Green,* 548 F.2d at 1266; *United States v. Acree,* 466 F.2d 1114, 1117 (10th Cir.1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973); *United States v. Collon,* 426 F.2d 939, 942 (6th Cir.1970); even if the evidence is circumstantial, *United States v. Prieur,* 429 F.2d 1237, 1238 (6th Cir.1970). It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt. *Prieur,* 429 F.2d at 1238. *See, United States v. Luxenberg,* 374 F.2d 241, 248 (6th Cir.1967).[2]

A review of the record reveals that the trial judge correctly articulated the standard by which he must adjudicate Rule 29 motions. The record also reveals that he thoroughly examined the evidence before enunciating his considered opinion denying the motions. The sole question for this Court's consideration, therefore, is whether the trial judge properly applied the standard. Determination of this question involves application of the same standard invoked by trial courts, for "[i]n reviewing denial of a motion for judgment of acquittal, we consider the evidence as a whole, taken in the light most favorable to the Government, together with all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt." *United States v. Patterson,* 644 F.2d 890, 893 (1st Cir.1981), (citing, among others, *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). *Accord, United States v. Weed,* 689 F.2d 752, 756 (7th Cir.1982); *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973).

■■■ This Court is convinced that there is evidence to support the jury's finding of guilt. As to the conspiracy to distribute marijuana and cocaine in violation of 21 U.S.C. § 846, as charged in Count I, there is substantial evidence against each defendant.

We need not indulge in an exhaustive recitation of the evidence contained in the entire trial transcript consisting of nineteen volumes exclusive of pre-trial and post-trial proceedings. Nevertheless, the Court notes that the government's evidence against these appellants demonstrated a well-organized, geographically and temporally extensive conspiracy to distribute cocaine. The government's evidence reveals that Adamo was, as a major importer of cocaine, the head of the conspiracy. Adamo supplied cocaine to Marsico who in turn supplied his distributors, including among others Ripley and Linkous. Linkous would, with the aid of Babcock and Hawley (unindicted co-conspirators turned informants), cut the cocaine and deliver it to numerous local distributors, including Garcia, Hong and Freeman. These transactions were, in effect, sales on consignment. Each member of the conspiracy was thus dependent on his source's indulgence in

---

2. It has also been held that a defendant's contradictory evidence is not to be considered on a motion for a directed verdict, *Robinson v. U.S.,* 144 F.2d 392, 401 (6th Cir.1944), *aff'd on other grounds,* 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945).

allowing him the opportunity to sell his consignment to obtain the money to pay for the supply, and in turn dependent on sales or re-sales to others to provide the money needed to pay the supplier and obtain future consignments.

The government's evidence also tended to establish that the conspiracy was composed of energetic salesmen who, like young executives in a legitimate corporation, were not adverse to elbowing their ways "up the ladder" in quest of greater profits. Thus, there were times when a distributor would try to "leap-frog" over his immediate source of supply to cut out a middleman, especially if the most immediate source had been "cut off" by *his* source because of some failure relative to the consignment sale arrangement. Such instances demonstrated the single-minded pragmatism of the members of the conspiracy relative to the object of the conspiracy: to amass power and wealth through the distribution of cocaine.

Though Linkous and Marsico were charged as co-conspirators in Count I, the trial judge correctly instructed the jury that Count I was a lesser included offense with respect to the offense charged against Linkous and Marsico in Count II of the indictment, and that the jury would only consider Count I with regards to either of those two defendants if the jury acquitted one or both of them of the offense alleged in Count II. Since the jury found Marsico and Linkous guilty of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, as charged in Count II, the jury did not return a conviction against either of these defendants as to Count I. The sufficiency of the evidence against Linkous and Marsico thus need be considered only with respect to the other counts in which they are named.

■ Counsel for Linkous claims that there is insufficient evidence to support the conviction on Count II because the evidence failed to show that Linkous occupied "a position of organizer, a supervisory position, or any other position of management" over five or more persons as required by 21

U.S.C. § 848. Counsel's argument on this issue is two-faceted. First, he claims that Linkous had a supervisory or managerial relationship with less than five people. Secondly, while conceding that Linkous did carry on drug transactions with several other people, counsel claims that Linkous did so without exercising management or control over those other persons.

The record, however, does contain sufficient evidence to support the jury's conclusion to the contrary, notwithstanding the fact that counsel advocated his position in his closing argument. For example, Hawley testified from his personal knowledge as "muley" or drug courier for Linkous that Linkous' distributors included Hong, Voss, Reisin, Defalco, and a Scott in Cincinnati. Hawley also referred to Brian Thompson, a Darlene, Jeff Adams, and an unnamed partner of Adams as persons in Canada who distributed marijuana for Linkous in 1977. Babcock named Freeman, Garcia, Hong, Jerry, a/k/a Picasso, and Defalco as persons who distributed cocaine provided by Linkous. It also must be remembered that the witnesses themselves were subordinate to Linkous; Hawley acting as muley and Babcock serving as bookkeeper. Thus, even if the jury concluded that some of the individuals named, most likely Freeman and Garcia, dealt with Linkous as equals, there is still sufficient evidence for the jury to conclude that at least five individuals were, as distributors, managed by Linkous. Thus, Linkous' contention that the evidence was insufficient to support a conviction as to Count II is without merit.

■ Marsico's counsel challenges the sufficiency of the evidence to support the conviction on Count II with the contention that the government failed to show that Marsico was an organizer, supervisor or manager as distinguished from minor employee or subordinate. In view of the testimony which indicates that Marsico obtained drugs from Adamo and supplied them to Linkous, Freeman, and Stella, each of whom in turn supplied other distributors, this argument is specious. Marsico's posi-

tion as supplier to Linkous, in light of the jury's finding that Linkous himself managed at least five other people, establishes *a fortiori* Marsico's violation of the statute which formed the basis for Count II.

■ Though Marsico and Linkous do not challenge the legitimacy of their convictions on Count V, there still remains to be considered Linkous' claim that the trial judge erred in failing to grant the Rule 29 motion based on insufficiency of evidence bearing on the charge in Count VI. This last count of the indictment was based on 18 U.S.C. § 1952(a)(1), which makes it unlawful to "travel in ... foreign commerce ... with intent to distribute the proceeds of any unlawful activity."

The charge in Count VI arose out of undisputed evidence that Linkous and Hawley went to Canada in the fall of 1978, purchased 2,600 leather coats with cash, brought the coats across the border and back to Columbus, rented a store and warehouse for thirty days, and sold the coats for less than the price charged in legitimate retail stores in the Columbus area. Babcock testified that this was done on Marsico's recommendation to provide Linkous with a "front"—a seemingly legitimate source for the large amounts of money Linkous was spending while "unemployed." [3] Hawley testified, consistent with Babcock's statement, that Linkous told him that the leather coats were bought and sold to show that Linkous had legitimate business dealings in Canada. This testimony by Hawley is consistent with his prior testimony that almost weekly in 1977 he transported marijuana to Canada for Linkous, received Canadian currency in exchange, and then sometimes aided Linkous in the process of exchanging the Canadian money for United States currency at an Ohio bank. The latter testimony regarding Linkous exchanging large sums of Canadi-

an cash was substantiated by employees of the Huntington National Bank.

This undisputed evidence shows that Linkous violated 18 U.S.C. § 1952(a)(1). This is not a case merely involving personal travel with proceeds from unlawful activity. Thus, *United States v. Lightfoot*, 506 F.2d 238 (D.C.Cir.1974), does not apply. Linkous was involved in the "laundering" of his money through the process of his travels. Nor do we believe that the government was required to establish that the persons selling the coats to Linkous knew that the transaction was being financed with illegally obtained gain. We have found no authority for that claim, nor do we believe that it is required by the statute. We agree with the trial judge, therefore, on the Rule 29 motion ruling under Count VI, and support his rationale for this ruling.

As indicated, there is evidence against each defendant which is sufficient to support the convictions on each count in issue. Complaints concerning a "lack of disassociated evidence" are legally inapposite and factually unfounded, *see, United States v. Burch*, 471 F.2d 1314, 1317 (6th Cir.1973); *Poliafico v. United States*, 237 F.2d 97, 115 (6th Cir.1956), *cert. denied*, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957) (uncorroborated testimony of an accomplice is sufficient to sustain verdict of guilty), as are appellants' objections regarding the quantum of evidence, *see United States v. Apollo*, 476 F.2d 156, 162 (5th Cir.1973) ("skimpy" evidence sufficient to sustain conviction of member of conspiracy).

■ It is true, as counsel for the appellants contend, that the testimony of Hawley, Babcock, and Ferenczy, the primary government witnesses, was frequently impeached, questioned, and sometimes contradicted. It is also true that the witnesses' credibility was mercilessly attacked before the jury. There is no place, however, for

---

**3.** Babcock testified that Linkous bought a condominium for her, paying the purchase price of $23,900 in cash using twenty, fifty, and one hundred dollar bills which he had obtained through his drug dealings. Babcock also testified that Linkous bought a BMW Bavaria for

her with cash. Babcock's statements regarding the cash purchase of the condominium were corroborated by the testimony of Jean Parker, the real estate broker who closed the deal and by Judith Schultz, the agent who sold the condominium to Linkous.

arguments regarding a government witness' lack of credibility in a Rule 29 motion for acquittal before a federal trial judge. A trial judge considering a Rule 29 motion may neither weigh conflicting evidence nor consider the credibility of witnesses. For example, the Seventh Circuit held in *United States v. Blasco*, 581 F.2d 681, 684–85 (7th Cir.1978), *cert. denied*, 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978), that the trial judge there erred in granting a judgment of acquittal after the jury returned a guilty verdict. The trial judge granted the Rule 29 motion on the basis of his personal conviction that the government's witnesses were unbelievable. The Seventh Circuit held, however, that since there was sufficient evidence to convict the defendants as charged if the jury chose to believe the testimony of the government witnesses, and since the jury had been properly instructed as to its role in assessing witness credibility, the jury verdict must stand. *Blasco*, 581 F.2d at 684–85. To hold otherwise would be to allow the trial judge to invade the province of the jury as the sole finder of fact in a jury trial.

■ With trial judges precluded from assessing witness credibility when considering Rule 29 motions, it is only logical that appellate courts reviewing denials of such motions also must share in the same prohibition, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), *United States v. Lopez*, 576 F.2d 840, 843 (10th Cir.1978), *United States v. Luxenberg*, 374 F.2d 241, 248–49 (6th Cir. 1967). Appellate courts, unlike trial courts, do not have an opportunity to observe witness demeanor and therefore are even less qualified to judge witness credibility.

[10] In holding that the trial judge properly denied the motions to acquit made on behalf of each defendant, we stress that attacks on witness credibility are simply challenges to the *quality* of the govern-

ment's evidence and not to the sufficiency of the evidence. Such attacks make for effective closing arguments on behalf of a defendant, but are irrelevant with regard to the Rule 29 insufficiency standard. Evidence may be held insufficient, therefore warranting taking the case from the jury, only if the government's case lacks evidence in support of one or more elements of the offense charged. See *United States v. Green*, 548 F.2d 1261, 1266 (6th Cir.1977) (quoting the "more than a scintilla" definition of substantial evidence from *United States v. Martin*, 375 F.2d 956, 957 (6th Cir.1967), and referring to prima facie case). *Accord, United States v. Knight*, 505 F.2d 112, 114 (5th Cir.1974). Attorneys will do well to bear in mind the distinction between quality and sufficiency of evidence when making Rule 29 motions and appealing denials thereof. Neither clients nor courts are served when procedurally proper motions are based on a misapprehension of the substance of the federal rules.

## II. Failure to Dismiss Indictment

Appellants Mario Adamo, Richard Marsico, Terry Freeman, Jeff Linkous, Ectore Garcia, and Winthrop Hong allege that the trial court erred in denying their motions to dismiss the indictment. While the arguments presented on appeal vary somewhat, the common threads running through all of the arguments are that the indictment was invalid because the Assistant United States Attorney withheld exculpatory evidence and used perjured testimony to obtain the indictment.

The starting point for consideration of all questions concerning judicial involvement in grand jury proceedings is, as all parties agree, the Supreme Court's seminal decision in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). This Court, which has had occasion to render no less than six decisions in 1982 in which *Costello* was invoked,[4] "has consist-

---

4. *I.e., In re Grand Jury Investigation*, 696 F.2d 449 (6th Cir.1982); *United States v. Markey*, 693 F.2d 594 (6th Cir.1982); *United States v. Warner*, 690 F.2d 545 (6th Cir.1982); *United States v. Nembhard*, 676 F.2d 193 (6th Cir.1982), *cert.*

denied, — U.S. ——, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983); *United States v. Short*, 671 F.2d 178 (6th Cir.1982); *cert. denied*, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982); *United States v. Brown*, 667 F.2d 566 (6th Cir.1982).

ently given the *Costello* language a literal reading: 'An indictment returned by a legally constituted and unbiased grand jury ... if valid on its face, is enough to call for trial of the charge on the merits.' 350 U.S. at 363 [76 S.Ct. at 409] ..." *United States v. Short,* 671 F.2d 178, 182 (6th Cir.1982), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982). There is no claim here that the grand jury was not "legally constituted" nor that the indictment returned was not "valid on its face." The sole claim presented is that the grand jury in this case was made biased by the conduct of the Assistant United States Attorney.

■ Initially, this Court notes that it is of the opinion that "bias," as used in *Costello,* refers to a grand jury which is predisposed in one way or another at the time of selection. Predisposition would exist if, for example, the cases to be considered by the grand jury involved minority group members or tax resistors and the prospective jurors were members of the Ku Klux Klan or Posse Comitatus, respectively. In an effort to detect persons with biases, whether pro- or anti-government, prospective grand jurors are routinely subjected to *voir dire* by district judges or magistrates prior to selection for grand jury duty. Prospective jurors who demonstrate bias are excused, just as they are during the process of selecting petit jurors. There is no claim here that the grand jurors who indicted the appellants were not subjected to *voir dire,* that the *voir dire* was inadequate, nor that jurors who demonstrated bias on *voir dire* were not excused. Thus,

there is no basis for the claim that the grand jury was biased in the sense that we understand *Costello* to employ that term.[5]

Assuming, however, that a grand jury which at its inception was legally constituted and unbiased can be made to fall short of the *Costello* standard by prosecutorial misconduct, defendants have failed to demonstrate that the grand jury here was so biased. This conclusion is based on several considerations, which are addressed in some detail in the following discussion.

## A. Exculpatory Evidence before the Grand Jury

■ We reject appellants' contention that an Assistant United States Attorney is under an "affirmative duty to ... disclose to the Grand Jury exculpatory evidence which tends to negate the guilt of an accused." The three cases cited in unison by all six appellants raising this issue, *i.e.,* *Matter of the Special April 1977 Grand Jury,* 587 F.2d 889 (7th Cir.1978), *Wood v. Georgia,* 370 U.S. 375, at 390, 82 S.Ct. 1364, at 1373, 8 L.Ed.2d 569 (1962), and *In re Gopman,* 531 F.2d 262 (5th Cir.1976), do not support this contention.

The first case cited arose out of claims made to the district court that government officials leaked prejudicial grand jury information to the media and that the government unlawfully prevented a witness favorable to the defendant from testifying before the grand jury, *Grand Jury,* 587 F.2d at 890. The sole claim on appeal, however, was "that the district court abused its discretion in dismissing [the petitioner's] petition [to terminate the grand jury proceed-

---

**5.** This understanding of the term "unbiased" is based on our apprehension of the logic and intent of *Costello.* We are convinced that the term "unbiased" must be construed in a way which would not authorize or compel Courts to interject themselves into the inner sanctum of the grand jury room once the jurors have been empaneled. Our confidence in the propriety of this interpretation of "unbiased" is enhanced by post-*Costello* interpretations by the Supreme Court of the companion terms "legally constituted" and "facially valid." These terms have been understood to require only pre-investigation and post-return of "a true bill" compliance with the requirements of grand jury procedure, *e.g., see,*

*Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (Defendant need not be member of excluded group to have standing to challenge composition of grand or petit jury venire), and *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (An indictment is sufficient if it contains the elements of the offense charged, fairly informing the defendant of the charge, and enables the defendant to plead double jeopardy.) By analogy, it is only logical that the term "unbiased" be construed to simply require that the system for selecting grand jurors be designed to eliminate bias before the grand jury's secretive proceedings begin.

ings] without an evidentiary hearing," 587 F.2d at 891. The Seventh Circuit affirmed the trial court's dismissal of the petition.

In *Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), the Supreme Court reversed a conviction on contempt charges arising out of a sheriff's written statements made to the public and to a grand jury during the course of a grand jury's investigation. The Court found that the sheriff's first amendment rights were violated by the contempt prosecution. There is no reference on page 390, 82 S.Ct. at 1373, nor anywhere else in the opinion, to efforts by anyone to withhold exculpatory information from the grand jury.

In considering *In re Gopman,* 531 F.2d 262 (5th Cir.1976), we again find that, as in *Wood v. Georgia,* neither the facts of the case nor any of the Court's reasoning has even a tangential reference to anyone withholding exculpatory information from the grand jury. Rather, *Gopman* arose when a district judge disqualified, on the ground of conflict of interest, an attorney who was counsel for both a union and three officers of the union who were called to testify before a grand jury regarding the officials' alleged failure to keep records as required by federal law, 531 F.2d at 264–65. The Fifth Circuit's affirmance of the trial court's order does nothing to establish the doctrine propounded by the appellants.

A federal prosecutor is not obligated to present exculpatory evidence to the grand jury. The question was squarely presented to this Court in *United States v. Ruyle,* 524 F.2d 1133 (6th Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 45 L.Ed.2d 175 (1976), in which the Court affirmed the decision of then District Judge Keith. The unanimous panel observed that, "[t]he function of a grand jury is investigative. Its proceedings are not adversary in nature, but rather consist of inquiries conducted by laymen without resort to the technicalities of trial procedure." 524 F.2d at 1135, citing *Costello v. United States,* 350 U.S. 359, 363–64, 76 S.Ct. 406, 408–09, 100 L.Ed. 397; *United States v. Levinson,*

405 F.2d 971, 980 (6th Cir.1968), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744 (1969); *United States v. Thomas,* 342 F.2d 132, 136 (6th Cir.1965), *cert. denied,* 382 U.S. 855, 86 S.Ct. 105, 15 L.Ed.2d 92 (1965). After quoting from *Costello,* the Court concluded its opinion with, "[t]he indictment in the present case was valid on its face and the defendant was not entitled to challenge it on the ground that information which he considered favorable to his defense was not presented to the grand jury." 524 F.2d at 1136. *Accord, United States v. Kennedy,* 564 F.2d 1329, 1335 (9th Cir.1977), *cert. denied, sub nom., Myers v. United States,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978) [a decision reached post-*U.S. v. Basurto,* discussed *infra*], where the appellant claimed unsuccessfully that his fifth amendment right to an indictment by an informed grand jury was abused by the prosecutor's admitted refusal to submit to the grand jury exculpatory evidence proffered by the appellant's trial attorney.

Thus, several of appellants' claims regarding the deficiency of the indictment fail when considered in light of *Ruyle* and its progeny. First, the prosecutor did not violate an affirmative duty to disclose exculpatory evidence to the grand jury because there is no such duty. Secondly, because evidence tending to undermine the credibility of witnesses testifying for the government before the grand jury is actually a form of exculpatory evidence, *United States v. Blanton,* 700 F.2d 298, 311 (6th Cir.1983), *vacated,* 703 F.2d 981 (6th Cir. 1983), *modified,* 719 F.2d 815 (6th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984) there is no merit to the claims that appellants' rights were violated because the Assistant United States Attorney failed to inform the grand jury that certain of the government's witnesses were granted immunity from prosecution for their own involvement in the conspiracy or were participants in the Department of Justice's Protected Witness

Program administered by the United States Marshal Service.[6]

 Likewise, the claim that the prosecutor should have informed the grand jury of Lisa Babcock's prior perjury before a state grand jury must fail.[7] Such information would have been useful to the grand jury only for the purpose of assessing Babcock's credibility. Even if the appellants' contention is that the *substance* of Babcock's prior perjured testimony, rather that the *fact* that she perjured herself, should have been presented to the grand jury for impeachment purposes or for the truth of the matter asserted therein, such evidence would have been exculpatory only, and therefor disclosure is not compelled.

 Since disclosure of exculpatory evidence is not required, it follows that failure to disclose cannot constitute prosecutorial misconduct productive of a biased grand jury. Appellants' claims to the contrary are without merit.

6. In *Loraine v. United States,* 396 F.2d 335, 339 (9th Cir.1968), *cert. denied,* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968), the Ninth Circuit held:

> that the trial court did not err in refusing to invalidate a federal indictment because the Government did not produce before the grand jury all evidence in its possession tending to undermine the credibility of the witnesses appearing before that body. [The defendant] was accorded the full protections of the Fifth and Fourteenth Amendments when, at the trial on the merits, he was permitted to expose all the facts bearing upon his guilt or innocence.

The same must be said for appellants in this case. *Accord, United States v. Eden,* 659 F.2d 1376, 1382 (9th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982).

Parenthetically, it is difficult to reconcile the contention that the prosecutor withheld *exculpatory* evidence from the grand jury by failing to disclose that some of the government's witnesses were in the Witness Protection Program with the claim, discussed *infra,* that it was *prejudicial* for the prosecutor to refer to that fact during the government's opening statement.

7. There was some dispute at trial over whether Babcock informed the Assistant United States Attorney prior to or after she testified for the federal grand jury that she had previously perjured herself before a county grand jury. The question is irrelevant, for Babcock freely admitted her prior perjury before the petit jury, af-

## B. Quality of Evidence before the Grand Jury

### 1. In General.

 Appellants also allege that the indictment was defective because it was based in part on evidence which they claim was later found to be inaccurate, erroneous, or in the case of the Voss ledger book, at least partially fraudulent. The thrust of all these claims is that the grand jury would not have returned "A True Bill" but for such misinformation.

The answer to appellants' "but for" contention is that it is sheer speculation to claim that the grand jury would not have returned an indictment if the evidence, both testimonial and documentary, complained of by the appellants had not been presented to the grand jury. Courts and counsel may not indulge in such speculation.[8] Even assuming for the sake of discussion that the matters complained of by appellants were false,[9] other evidence was presented to the

fording those jurors ample opportunity to assess her credibility in light of her admission. Appellant's rights would have been violated only if the prosecutor had withheld this potentially damaging information from the petit (trial) jury, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

8. "Speculation as to the jury's evaluation is both improper and futile," *United States v. Meyers,* 646 F.2d 1142, 1145 (6th Cir.1981).

9. We are in fact of the opinion, however, that much of the "falsity" alleged by appellants is the product of appellant's interpretation of the testimony. For example, Magoch's testimony that the Voss ledger had been authenticated is not false when considered in conjunction with Babcock's statement to him that she saw Voss keeping accounts of the drugs stored in his warehouse. Similarly, Magoch's testimony that Hong was from Texas was based on information provided to him by Frank Ferenczy. Other matters which appellants have raised objections over are not prejudicial, even if inaccurate, as is the case regarding Hong and Adamo's objections to statements regarding the amounts of drugs which they handled. *United States v. Woods,* 568 F.2d 509, 512 (6th Cir.1978), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 64 (1978), ("It is axiomatic that to be found guilty of possession of heroin with intent to distribute in contravention of 21 U.S.C.

grand jury. "It is enough ... that there is *some* competent evidence to sustain the charge issued by the Grand Jury even though other evidence before it is incompetent or irrelevant in an evidentiary sense or even false." *Coppedge v. United States,* 311 F.2d 128, 132 (D.C.Cir.1962) *cert. denied,* 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963) (emphasis in original) quoted with approval in *United States v. Short,* 671 F.2d at 181. Furthermore, we are reminded that federal courts are not permitted to test the evidence supporting an indictment. In *Short,* the trial judge who dismissed a count of an indictment after he concluded that there was absolutely no evidence before the grand jury in support of the conspiracy charge, 671 F.2d 178, was reversed.

As the Supreme Court explained in *Costello,* 350 U.S. at 363, 76 S.Ct. at 408–409 (1956):

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough

to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

(footnote omitted).

This language from *Costello* can only be read to hold that a grand jury presented with inadequate or incompetent evidence may nevertheless be an unbiased grand jury capable of returning a valid indictment. Appellants' claims that the prosecutor presented to the grand jury evidence which appellants consider inadequate or incompetent, thereby creating a biased grand jury, cannot be reconciled with the Supreme Court's holding. Thus, appellants' attacks on the validity of the indictment, and the trial court's refusal to dismiss the same, must fail.

**2. Allegations of Perjury and Prosecutorial Misconduct**

We think, however, that appellants' contentions regarding the government's use of the Voss ledger book before the grand jury merit a more extensive examination. Those contentions may properly be construed to be a claim that the use of the ledger book was tantamount to the use of perjured testimony since two entries in the ledger were shown by government laboratory testing conducted after the indictment was returned to have been made with ink which was first manufactured after the date of the purported entries.[10]

The Ninth Circuit has held in *United States v. Basurto,* 497 F.2d 781, 785–86 (9th Cir.1974),[11] that

§ 841(a)(1), the evidence at trial need not establish the precise amount of heroin alleged in the indictment. It is sufficient if the substance is in fact heroin and if it is measurable.")

**10.** We understand that appellants' claim regarding the use of perjured testimony was made with respect to Babcock's testimony, but as indicated above, we think *prior* perjury is a credibility matter only.

**11.** After the Ninth Circuit reached its decision in *Basurto,* Justice Rehnquist was asked to stay enforcement of a Ninth Circuit judgment pending consideration of the petitioners' petition for certiorari. The contention raised in the petition was that a witness had committed perjury before the grand jury which had indicted the peti-

tioners on narcotics charges. In denying the application for a stay of judgment, Justice Rehnquist observed:

> Because it seems to me that applicants misconceive the function of the grand jury in our system of criminal justice, I cannot conclude that four Justices of this Court are likely to vote to grant their petition. The grand jury does not sit to determine the truth of the charges brought against a defendant, but only to determine whether there is probable cause to believe them true, so as to require him to stand trial. Because of this limited function, we have held that an indictment is not invalidated by the grand jury's consideration of hearsay, *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), or by

the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel—and, if the perjury may be material, also the grand jury—in order that appropriate action may be taken.

In that decision, the Ninth Circuit reiterated the holding of *Costello*, 497 F.2d at 785, and stressed its view that its decision did not effect the established rule by invading the independence of the grand jury.

The effect of the Ninth Circuit's *Basurto* holding was to impose upon the prosecutor tandem duties to scrupulously avoid the knowing use of perjured evidence at any point in the prosecution of a case and to take corrective action with regards to perjury discovered only after the false evidence was presented.[12] The Ninth Circuit emphasized that these duties were imposed upon the prosecutor and did not in any way authorize courts to dictate to grand juries the types and amounts of evidence which they can or cannot consider, 497 F.2d 785–87, and 793–94. Other Ninth Circuit deci-

sions reached after *Basurto* and cited previously in this opinion attest that the Ninth Circuit continues to refuse to invade the province of the grand jury, and will in fact quash an indictment only if based on perjured material testimony knowingly used by the prosecutor.[13]

We are in agreement with the basic ethical philosophy of the Ninth Circuit's *Basurto* decision, especially as it requires the prosecutor to avoid knowingly using perjured testimony at any point in the prosecution of a case. We disagree, however, with the portion of the decision which requires the prosecutor, upon learning of material perjury before the grand jury, to return to the grand jury and seek a superseding indictment if jeopardy has not yet attached or suffer the sanction of having the indictment quashed. Further, while the *Basurto* decision does not address the question, we think it implies that the prosecutor would be obligated to move for dismissal if it were discovered during the trial that some material testimony before the grand jury had been perjured. For the reasons discussed hereafter, we feel that this also is not mandated.

As a practical matter, an Assistant United States Attorney is not only con-

the introduction of evidence obtained in violation of the Fourth Amendment, *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). While the presentation of inadmissible evidence at trial may pose a substantial threat to the integrity of that factfinding process, its introduction before the grand jury poses no such threat. I have no reason to believe this Court will not continue to abide by the language of Mr. Justice Black in *Costello, supra*, 350 U.S. at 363, 76 S.Ct. at 409: 'An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.' *Bracy v. United States*, 435 U.S. 1301, 1302–03, 98 S.Ct. 1171, 1172, 55 L.Ed.2d 489 (Opinion in Chambers 1978). As predicted, the petition for certiorari was denied, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978).

12. The majority in *Basurto* held that the prosecutor has a duty of good faith with respect to the Court, the grand jury, and the defendant,

497 F.2d at 786. Judge Hufstedler, in a special concurrence, stated that "[e]ven though breach of that prosecutorial duty [to seek dismissal of a tainted indictment] may not constitute a violation of defendant's constitutional rights, the prosecutor is nevertheless responsible to the court for conduct that is potentially detrimental to the integrity of the judicial system," 497 F.2d at 794.

13. *E.g., United States v. Eden*, 659 F.2d 1376 (9th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982); *United States v. Thompson*, 576 F.2d 784 (9th Cir.1978); *United States v. Kennedy*, 564 F.2d 1329 (9th Cir.1977), *cert. denied, sub nom., Myers v. United States*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). It appears that the Ninth Circuit continues to refuse to quash indictments on grounds that exculpatory evidence was withheld because they continue to recognize, as we did in *Ruyle*, that grand jury proceedings are non-adversarial.

cerned with making sure that nothing undermines a defendant's right to a fair trial, but is also concerned with securing convictions. Therefore, a federal prosecutor faced with a situation analogous to that here must personally weigh the untainted evidence supporting the government's case and decide if the evidence is such that a jury of twelve is likely to unanimously find that the evidence establishes guilt beyond a reasonable doubt. If the prosecutor is doubtful of such a result, the untainted evidence may be resubmitted to the grand jury to determine if thirteen grand jurors are prepared to find that a crime was committed and that there is probable cause to believe that one or more of the original defendants committed that crime. The prosecutor may also decide that the untainted evidence is insufficient to warrant pursuing the prosecution further and move to dismiss the indictment. A conscientious government attorney will go to trial only if personally satisfied that the untainted evidence is sufficient to meet the government's burden of proof, despite the fact that trial is fully adversarial and subject to the federal rules of evidence and procedure. We see no reason to impose the rigid Ninth Circuit rule and deprive the prosecutor of the right to exercise these options.[14]

Another panel of this Circuit has observed in *United States v. Nembhard*, 676 F.2d 193, 200 (6th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983), that

[t]he Supreme Court recently concluded that because of the strong public interest in prosecuting serious crimes, prejudice to the defendant must be shown before dismissal of an indictment would be warranted when the government has inter-

fered with a defendant's Sixth Amendment right to counsel. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). The Tenth Circuit in *United States v. Drake*, 655 F.2d 1025 (10th Cir.1981), extended the *Morrison* rationale to require that actual undermining of a fair trial must also be demonstrated when a federal court uses its supervisory powers rather than a constitutional basis to dismiss an indictment for prosecutorial misconduct.

We continue to adhere to this line of case law, none of which was available to the Ninth Circuit when *Basurto* was decided. The facts in this case illustrate why a rule requiring a showing of actual prejudice is preferable.

■ The grand jury which indicted all the appellants in this case received the "Voss ledger book" as evidence. Subsequent to the issuance of that indictment, testing by a government laboratory revealed that two of the entries in the ledger were fraudulent. Other entries so tested were not found to be fraudulent, but there is no indication that all the entries were tested. In any case, the Assistant United States Attorney was faced with a dilemma: Should he go back to the grand jury or should he proceed to trial on the merits? In this case, the prosecutor chose to go to trial but to refrain from using any part of the ledger in presenting the government's case. This decision insured that there was no "prejudice" or "actual undermining of [the appellants' right to] a fair trial," 676 F.2d at 200, because the ledger was not used to secure the convictions.[15] The decision also avoided the knowing use of perjured testimony, absent which there was no

14. While the Sixth Circuit approach affords more flexibility to federal prosecutors faced with post-indictment discovery of perjury than the Ninth Circuit rule, we must also consider the impact of both rules on defendants. Having done so, we conclude that neither rule is more advantageous to defendants. We well realize that merely being indicted is ruinous for some defendants, but for such persons, neither the Sixth nor the Ninth Circuit rule affords any benefit. Being re-indicted, as required by the

Ninth Circuit, may in fact make matters worse by postponing the trial where the defendant may ultimately be exhonerated.

15. Interestingly, the defendants unanimously stipulated to the admission of the Voss ledger as an exhibit and some used it during closing arguments in support of their contention that the government's entire case had been based on a fabricated document.

prosecutorial misconduct and no lack of due process.

 Finally, our approach does not render our Courts powerless against a prosecutor who abuses the office, for the power to exercise supervisory control over the prosecutor to protect the integrity of the judicial system remains. This power includes the authority to dismiss an indictment when appropriate. However, such supervisory power should be exercised, in the words of the *Nembhard* panel, sparingly, "and only on a showing of demonstrated and longstanding prosecutorial misconduct," 676 F.2d at 199, (citing decisions of both the Second and Ninth Circuits). Since appellants did not demonstrate longstanding prosecutorial misconduct, we hold that claims that the trial judge erred in failing to hold hearings on the motions to quash the indictment, *April Grand Jury*, 587 F.2d at 892, and to exercise supervisory control are unfounded.

### III. Admission of Evidence Regarding Iowa Marijuana Transactions

 Appellants Linkous, Ripley, Freeman, Marsico, and Adamo also allege that the trial judge erred in allowing Hawley to testify regarding his role as muley in what appellants refer to as the "Iowa marijuana transactions." In considering the various grounds for finding error proffered by the appellants, we note initially that we find no merit in the claim made by Ripley that Hawley's testimony was hearsay. Hawley's testimony regarding his own conduct is simply not hearsay as defined in Rule 801(c) of the Federal Rules of Evidence, and thus appellant Ripley's reliance on cases concerning the admissibility of hearsay statements in conspiracy trials are inapposite. Having so noted, we turn to give more extensive consideration to the claim that testimony regarding the so-called "Iowa marijuana transactions" should not have been admitted because the testimony

did not concern any of the defendants on trial and was therefore not in furtherance of the conspiracy with which the appellants were charged.

 Hawley gave direct testimony regarding his involvement in the "Iowa marijuana transactions" at the pretrial Rule 801(d)(2)(e) hearing [16] and at trial. Hawley testified at trial that the marijuana he picked up in Florida with David Calderwood at Voss and Kellner's request was delivered to Iowa *and* to Voss' house in Columbus, Ohio. The totality of this testimony must be considered in light of Hawley's prior trial testimony that in 1977 and 1978 he made deliveries between Linkous and Voss and, at the behest of either Linkous or Voss, picked up or delivered drugs to others in places scattered throughout the United States and Canada.

As previously mentioned, in Count I of the indictment the grand jury named Donald Voss, Dyana Kellner, and Davis S. Calderwood, in addition to the appellants presently before this Court, as members of the conspiracy to distribute cocaine and marijuana. At the time of the appellants' second trial Calderwood was a fugitive. Voss and Kellner were granted separate trials, and Voss pled guilty to a superceding information in which he was charged with conspiracy to distribute marijuana. The overt acts alleged in the information were essentially the same as those in the indictment except that references to cocaine were omitted.

The transcript of the second trial contains evidence which, if believed by the jury, supports each of the marijuana-related allegations in the indictment. Thus, appellants' claims that evidence regarding the "Iowa marijuana transactions", which according to Hawley's testimony were actually Iowa-Ohio transactions, was not related to the conspiracy with which appellants

---

16. By stipulation of counsel, Judge Holshuh's memorandum concerning his findings after the 104(a) hearing (encompassing Rule 801(d)(2)(e) matters) was filed *nunc pro tunc* after the jury returned its verdict. This was done to keep the jury from learning that the Court had found sufficient evidence of a conspiracy to warrant admission of hearsay statements made by co-conspirators.

were charged are rejected. The evidence at trial supports the conclusion that the disputed transactions were part of a single continuing conspiracy.

The fact that law enforcement officials knew of and encouraged Hawley's participation in the transactions does not alter the fact that co-conspirators Voss and Kellner contacted Hawley and requested his participation. Furthermore, the Iowa-Ohio transactions are indistinguishable from numerous other drug transactions for which Hawley acted as muley except that the co-conspirators involved in the Iowa-Ohio transactions were not defendants in the appellants' trial.[17] This fact appears to be the gravaman of the appellants' complaint regarding the admission of this evidence.[18] "When two or more persons are shown to have been engaged in the same unlawful conspiracy, having for its object the same common and unlawful purpose, it is not necessary to prove the knowledge by one of the dealings, or even of the existence, of the others, in order to render evidence of the actions of those others admissible against that person." *Poliafico v. United States*, 237 F.2d 97, 104 (6th Cir.1956), *cert. denied*, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957). The Iowa-Ohio marijuana transactions were part and parcel of the general on-going drug conspiracy of which the appellants were members.[19] Having so concluded, the evidence concerning those transactions was admissible against the appellants.

The admissibility of such evidence is the corollary of the well-established axiom that a criminal conspiracy is a partnership in crime to which the rules of agency apply. *United States v. Apollo*, 476 F.2d 156, 162 (5th Cir.1973). As stated by the Fifth Circuit in *United States v. Decker*, "the theory of vicarious liability is particularly applicable in narcotics distribution conspiracies and we find no reason for not so holding in the instant case." 543 F.2d 1102, 1104 (5th Cir.1976), *cert. denied, sub. nom. Vice v. United States*, 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390 (1977).[20] *Accord, Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) ("[I]n the law of conspiracy[,] the overt act of one partner in crime is attributable to all".),[21] and *United States v. Finazzo*, 704 F.2d 300 (6th Cir.1983), *cert. denied*, —— U.S. ——, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983) (tacitly approving use of "Pinkerton charge" by trial court in instructing jury.)

■ In concluding this section of this opinion, one final matter must be addressed. Appellant Linkous claims that the record is clear that he had terminated his relationship with the individuals involved in the Iowa-Ohio marijuana transactions before the transactions occurred. This assertion cannot be equated with a claim that he had terminated his involvement in the conspiracy. The record is devoid of any evidence that Linkous or any other appellant performed some affirmative act to demonstrate his withdrawal

---

17. On cross-examination before the jury, Hawley conceded appellants' lack of personal involvement in the transactions.

18. It is ironic that some appellants contend that evidence regarding the conduct of co-conspirators who were not joined in the appellants' trial should not have been admitted, while other appellants claim that they should have been granted separate trials. The evidence concerning the marijuana transactions related to the conduct of co-conspirators who had been granted severances (except for Calderwood, who was a fugitive). Thus, the irony lies in the fact that whenever co-conspirators request and are granted separate trials, they are necessitating the submission of evidence concerning co-conspirators who are not co-defendants because the government must re-establish the entire conspiracy in each trial.

19. In so finding, we rely in part on another panel's discussion of the multiple-single conspiracy question in *United States v. Warner*, 690 F.2d 545 (6th Cir.1982), a case which is factually similar to the case before this panel.

20. See also a companion case to Decker, *sub nom., United States v. Alonzo*, 571 F.2d 1384 (5th Cir.1978), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978).

21. The Supreme Court in Pinkerton "sustained the conviction of a defendant for a substantive offense committed by a fellow conspirator [in furtherance of the conspiracy] while the defendant was in the penitentiary and had no knowledge of the crime." *Poliafico*, 237 F.2d at 106.

from the conspiracy. *Poliafico*, 237 F.2d at 106, and thus appellants' membership in the conspiracy is deemed to continue up to the date specified by the grand jury in the indictment. Once a person becomes a member of a conspiracy, he or she may "be held responsible for all that *may be* or has been done" by coconspirators. *Poliafico*, 237 F.2d at 104, cited with approval in *United States v. Gravier*, 706 F.2d 174, 177–78 (6th Cir.1983). We find Linkous' contention to be without merit.

### IV. Witness Protection Program

■ Numerous appellants contend that the Assistant United States Attorney who prosecuted the case for the government should not have been allowed to make reference to [22] nor elicit testimony regarding participation by Hawley, Babcock, and Ferenczy in the Witness Protection Program. The thrust of appellants' complaint is that such information implied to the jury that the witnesses needed protection from the appellants and that such information tended to bolster the witnesses' credibility by raising the inference that their testimony must be truthful because they would neither need nor be afforded protection if they were the source of false information.[23]

This Court is well aware of the tactical problems presented to both prosecution and defense counsel when participants in the Witness Protection Program are called to testify in criminal trials. Information that a witness is a participant in this congres-

sionally created program, and therefore is being paid and protected by the federal government, simultaneously enhances and undermines a witness' credibility. For this reason, we readily perceive that an attorney who refers to or elicits testimony regarding a witness' protected status is wielding a two-edged sword.

However, review of the transcript in this case shows that, contrary to appellants' contention, the prosecutor in this case did not choose to wield the two-edged sword during his opening statement. Only two statements made by the prosecutor in any way deal with the credibility of the government's witnesses rather than the nature of the charges against the defendants. In reference to Lisa Babcock, the prosecutor said, "[h]er testimony will reveal that she has been granted immunity to testify in this case. She will tell you that almost two years ago she lied to a County Grand Jury about some of these matters. She did so because she was frightened." A few moments later, the prosecutor also stated that,

> The testimony will also reveal that the Federal Government has spent a good deal of money to relocate, support and protect these three individuals. The evidence will show that the majority of this money was spent for lodging, meals and transportation, and that the Government has not bought their testimony."

**22.** Counsel for several of the appellants stated in their briefs that "false and misleading evidence was repeatedly presented to the jury when the prosecutor made statements in opening and closing arguments about ...." As Judge Holshuh repeatedly and correctly instructed the jury, statements of counsel are not evidence. Since counsel for several appellants repeated this instruction during their own closing statements, we conclude that the quoted references to statements being evidence, as found in the briefs, are the product of imprecision and not ignorance.

**23.** Several appellants contend that "the impact of the witnesses' repeated association with being on a federally 'protected' program ... had the added effect of also falsely enhancing the credibility of their otherwise incredible testimony by

creating an inference that their testimony had to be true because they had to seek protection, and were given protection, as a result of their co-operation with the Government." This is a *non sequitur*. It is common knowledge that criminals who cooperate with law enforcement authorities are viewed with great hostility by other criminals who do not so co-operate, without regards to the veracity of the information provided or the utility of the assistance afforded. It is also understood that an individual is entitled to the government's protection when threatened, whether or not that individual is providing anything to the government in return. Finally, none of the participants in the Witness Protection Program even suggested that they were threatened by any of the defendants. *See also*, fn. 6, *supra*.

When heard with the ears of defense attorneys who were very well aware of the facts behind these statements, these remarks could appear to carry prejudicial inferences. The prosecutors statements were not made, however, to or for the benefit of defense counsel. Rather, the comments were addressed to jurors who were hearing about the case for the first time. The jurors had no way of knowing what caused Babcock to be "frightened" when she testified falsely before a county grand jury. While we will not speculate as to what, if anything, the jurors thought about the reference to fright, we think that when viewed in context, the reference in no way implied that any of the defendants caused Babcock to be frightened. Likewise, the second statement, when considered in its entirety, shows that the prosecutor was concerned with preparing the jury for attacks which would be made upon the credibility of government witnesses because they were paid informants.[24] The passing use of the word "protect" in the government's opening statement is incapable of producing the prejudice complained of by appellants. In this case, therefore, we find no prejudice to the appellants from the prosecutor's remarks.

Nevertheless, we disapprove of reference by the government's attorney to a witness being protected in a case where it is not obvious, relevant, nor made an issue by defense counsel, and we encourage trial judges to instruct such witnesses not to refer to their participation in the program when testifying before the jury. We decline, however, to announce a hard and fast rule prohibiting any reference by anyone to a witness' participation in the United States Marshal's Witness Protection Program.[25]

There are times when a defense attorney will want to show that a prisoner who is also a protected witness has benefited from participation in the program because such information could have a bearing on the prisoner-witness' credibility.[26] It is also conceivable that a prosecutor may feel compelled to explain to the jury through testimony why the government's witness is testifying in chains or while guarded by a deputy marshal, since the testimony of a person so situated is rightfully viewed with considerable skepticism and curiosity by jurors.[27] Finally, it is also possible that a

**24.** The prosecutor had reason to anticipate such attacks because of his experience in the first trial in this same case. The anticipated attacks were not long in arriving. When compared to the statements made by defense counsel, the statements made by counsel for the government seem almost reserved.

**25.** A distinction must be made between government witnesses who are merely paid informants and those which are participants in the Witness Protection Program. References to a witness being a paid informant undermine the credibility of the government's witness without raising any negative inferences against a defendant. There is no reason therefore to deny to a prosecutor the opportunity to follow the football adage that "the best defense is a good offense" and make the tactical decision to inform the jury of the witness' status before defense counsel launches the attack on credibility. A *totally different* concern arises when the government's witness is protected, for this may in some cases raise negative inferences against the defendant if great care is not employed. We note that counsel in this case frequently used the term "witness relocation program." While this is not the technically correct term, it is a term which avoids the possible negative implications of "protection" and thus presents one possible solution to this problem, especially if the witness is also cautioned by the Court to refrain from referring to protection.

**26.** The decision to explore such matters is a tactical decision for defense counsel, for when the "door is opened," the prosecutor should be allowed to try to rehabilitate the credibility of the witness-prisoner. In the present case, the protection issue, as distinguished from the paid informant issue, was argued forcefully and extensively by certain defense counsel during opening statements. It was defense counsel's right to do so, at least within the very generous limits imposed by Judge Holshuh. Counsel apparently thought that the witnesses' involvement in the program was a matter which should be put before the jury for its consideration. When defense counsel so determines, the door is opened for the government, not for unlimited haranging about the need for protection, but for the sort of restrained response employed by the prosecutor in this case.

**27.** The better course is probably for counsel to ask the trial judge to contemporaneously instruct the jury that the protection afforded the witness should neither enhance that witness' credibility nor necessarily be construed to mean a

witness' need for protection is an element of the government's case, as in a prosecution under 18 U.S.C. § 1503. The inapplicability of the general principle in that latter instance is readily apparent. Thus, flexibility tempered with a concern for justice is the principle which must be applied to cases where this issue arises.

## V. Double Jeopardy

Appellant Garcia has raised an issue which relates only to himself. He claims that the federal prosecution in Ohio violated his fifth amendment right against double jeopardy[28] because he had been tried for the same offense in federal court in Missouri. It is apparent from the briefs submitted by counsel and from the careful opinions of the trial judge regarding this issue[29] that all concerned had considerable difficulty in coming to grips with this question. After careful consideration, we are convinced that the key question presented by the facts in this case was never raised in the Court below.[30]

■ The trial court correctly invoked this Court's recent decision in *United States v. Jabara*, 644 F.2d 574, 576 (6th Cir.1981), which requires "a trial court, confronted with a non-frivolous double jeopardy claim, to shift to the government the burden of proving by a preponderance of the evidence that it is not seeking to prosecute the same offense a second time."[31] The indictments out of Ohio and Missouri both alleged that Garcia was a middle-level supplier in a cocaine distribution scheme. In the Missouri indictment, the grand jury named the people supplied by Garcia with cocaine, but only alleged that Garcia "would obtain from unknown

---

that the defendant has threatened the witness. Jurors are quite capable of understanding that government informants are the objects of the hostility of any general prison population and the "at large" criminal community. Jurors should therefore be able to accept the idea that the need for protection has not been created by the defendant. On the other hand, unless abuse by the prosecutor is shown, we do not require the Court to handle the matter of protected witnesses itself.

**28.** The fifth amendment provides in relevant part: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

**29.** This procedural history includes the filing of the written motion and opposition, two pre-trial hearings, the preparation of two opinions by the Court, the making of various oral motions throughout the trial to preserve the issue, and oral rulings by the Court on each of these oral motions.

**30.** The factors which Garcia contends support his double jeopardy claim may be summarized as follows: 1) the indictments in both cases refer to Miami, Florida and Columbus, Ohio; 2) the claim that the persons referred to as "others known and unknown to the Grand Jury" in the Missouri indictment were the persons indicted in Ohio and, conversely, the "persons both known and unknown" to the Ohio grand jury were the persons named in the Missouri indictment; 3) both indictments alleged a conspiracy to distribute cocaine in violation of the same federal statute; 4) each indictment contained an overt act which referred in some respect to Columbus, Ohio; 5) the time frame of the Missouri indictment falls within the time frame of the conspiracy alleged in the Ohio indictment; 6) the prosecution in the Ohio trial offered an exhibit which related to a "Tony," allegedly a member of the Missouri conspiracy; and 7) the section entitled "prosecution's version" of the probation officer's pre-sentence report on Garcia contained references to Garcia's drug trafficking activities in Missouri. The trial judge correctly found that these claims, when considered collectively, made out a non-frivolous claim of double jeopardy. (The trial judge also properly excluded from evidence referred to in claim 6 on the grounds that there was no showing that it related to any issue in the Ohio conspiracy trial.)

Only the second claim suggests the question which we have deemed decisive of the double jeopardy issue, but the suggestion was sufficiently remote and subject to such differing interpretations that the trial judge can hardly be faulted for failing to make of it what we have made. This is especially true since the trial judge was not afforded the opportunity for reflection which has been so beneficial to our thinking on the matter.

**31.** The trial judge also referred to the Eighth Circuit's "totality of circumstances" test which this Circuit formally adopted in *Jabara*, 644 F.2d at 577. While legally preferable to use of the "same evidence" test in a conspiracy context, the present case well illustrates that this new standard affords a trial judge much less guidance than the old standard. Elaboration on what constitutes the "totality of circumstances" will be needed in the future to give this test some substance.

sources large quantities of cocaine." In the Ohio indictment, the grand jury alleged that Adamo supplied Marsico, Linkous and others with cocaine, and that Linkous arranged for the distribution of cocaine to Garcia and others,[32] but did not indicate to whom Garcia sold the cocaine. These factors, especially when considered in conjunction with the overlap in the timeframes of the two indictments, raise the possibility that the two indictments represented two halves which could be "coupled" through Garcia to create one conspiracy. Accordingly, the burden was on the government in this case to show by a preponderance of the evidence that the co-conspirators who supplied Garcia with cocaine in the Ohio case were not Garcia's source for the cocaine which he distributed in the Missouri case.

■ The question of Garcia's cocaine source is the key to the double jeopardy claim for a very basic reason. The government would have been allowed to charge Garcia's co-defendants in the Missouri case as members of the Ohio conspiracy if the Missouri co-conspirators were receiving the cocaine which Garcia had obtained from Adamo and Linkous. That is, the government would have been allowed to so charge if those Missouri co-defendants had not already been convicted in Missouri. If Garcia had distributed cocaine obtained from the Ohio conspiracy to the people named in the Missouri indictment, then such distribution was in furtherance of the Ohio conspiracy and a part thereof. On the other hand, if the cocaine distributed to the people in Missouri was supplied to Garcia by persons not named in the Ohio indictment, then two separate conspiracies could be demonstrated.

We realize that in order to make the showing which we have deemed crucial, and thereby meet the burden placed upon the government, the prosecutor in this case would have had to produce evidence regarding Garcia's source in the Missouri case, even though such evidence was presumably unavailable to the Missouri prosecutor. This is, however, nothing more than a disadvantage which flows from the decision of either the Missouri or the Ohio prosecutor to charge Garcia with conspiracy rather than one or more substantive offenses. Thus, while we agree with the Ohio prosecutor's observation that, "when ... the government in the Western District of Missouri, charged Mr. Garcia with his conspiracy to buy and sell cocaine and to agree to do that, it certainly did not intend to, at the same time, give out a lifetime insurance policy to Mr. Garcia insuring him from the possibility of being charged in other districts by other authorities for separate actions," the framers of the fifth Amendment did not intend to allow a person to be twice subjected to federal prosecution absent a showing that "separate actions" or conspiracies in fact provide the basis for the separate prosecutions. The prosecution has failed in this case to make such a showing. Accordingly, Appellant Garcia's Ohio conspiracy conviction must be vacated.

### VI. Other Assorted Claims

#### A. Search of Hong's Apartment

■ Appellants Hong and Linkous have both challenged the propriety of the warrantless entry by Columbus police officers into Hong's apartment during Hong's "birthday party," the seizure of various persons (including Linkous) present in the apartment at the time the police entered the premises, and the search and seizure of items within the apartment after the arrival of a search warrant. Linkous' objections must be rejected under the authority of *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), for a guest at a party has no expectation of privacy and therefore no standing to raise a fourth amendment claim regarding the search of

---

**32.** The government's proofs at trial indicated that Garcia sometimes supplied drugs to Linkous, though the flow of drugs was generally from Linkous to Garcia. (See *e.g.*, discussion in part I of this opinion, *supra*.) This illustrates that the conspirators were not organized into a rigid hierarchy, but were united in a collective effort to make money through distributing drugs and would assume any role or perform any task aimed at achieving that goal.

the premises or the seizure of items found there. His detention by the officers after he was detected trying to escape through the rear exit of the apartment was also justified under the circumstances.

■ As for appellant Hong's claims regarding the warrantless entry into his apartment, the pre-trial record reveals that the officers involved were in possession of sufficient information provided by informants and their own surveillance of the premises to conclude reasonably that Hong had returned from Florida that every day with a quantity of cocaine and was in the process of distributing it to the known narcotics traffickers and others entering and exiting his apartment. The conclusion that evidence, that is, cocaine, was actually being "lost" through distribution before their very eyes justified the officer's belief that exigent circumstances existed. *United States v. Guidry*, 534 F.2d 1220, 1223 (6th Cir.1976). The fact that other possible explanations for the activities observed by the surveilling officers existed is irrelevant, as long as the officers were able to articulate factors which gave them probable cause to believe that evidence of a crime was being lost, *United States v. Delguyd*, 542 F.2d 346, 351 (6th Cir.1976). Thus, we agree with the trial judge's findings that the warrantless entry into Hong's apartment for the purpose of securing the premises and the evidence it was believed to contain was justified by exigent circumstances rendering the entry constitutionally reasonable, *Guidry*, 534 F.2d at 1223.

■ Furthermore, while we find the delay between the time of entry into the apartment until the arrival of the search warrant to be inordinately long, and the excuses offered to explain the delay to be less than totally convincing, we cannot say that the evidence before the trial judge does not support his finding that suppression of the fruits of the search conducted once the warrant arrived was not constitutionally mandated, *see, United States v.*

*Upthegrove*, 504 F.2d 682, 686 (6th Cir. 1974). The entry into and search of Hong's apartment do not warrant the vacation of his conviction on Count I of the indictment.

**B. Denial of Motions for Severance**

■ Both Garcia and Hong claim that the trial court erred in denying their motions for severance. Though it might have been advisable to try the defendants in smaller groups of perhaps three or four, the question of severance is for the trial judge and will not be set aside absent demonstrated abuse of discretion, *e.g., United States v. Porter*, 701 F.2d 1158, 1166 (6th Cir.1983). The trial court did not abuse its discretion in denying the motions for severance in the instant case.

**C. Hong Objections Regarding Alias**

In the indictment returned by the grand jury, appellant Hong was referred to as "Winthrop Hong, aka 'Chinaman'." Hong now contends that the use of this alias was prejudicial and that the evidence submitted at trial was insufficient to identify him as "Chinaman."

■ Examination of the record reveals, however, that Hong was in no way prejudiced at trial by the references in the indictment to an alias. The trial judge redacted the references to all aliases when reading the indictment to the jury at the commencement of trial.[33] The first time the jury heard the term "Chinaman" was in the closing statements of Hong's counsel. The claim of prejudice is therefore without merit.

■ The claim that the evidence was insufficient to identify Hong as the Chinaman is specious, since there was no burden on the government to present such proof. The government did not depend on proof that Hong was the Chinaman to link him to the conspiracy with which he was charged. On the contrary, Hong was identified as Hong by numerous government witnesses,

---

**33.** Judge Holschuh included the alias references when he read the indictment to the jury during the instruction phase at the close of the trial.

This was done, despite his own personal misgivings, upon the insistence of Hong's counsel.

including former members of the conspiracy, during trial. Thus, this latter claim regarding the alias is also without merit.

## D. Other Claims

Various appellants claim that the trial judge erred in admitting the hearsay statements of their co-defendants, in denying the motions for discovery regarding the identities of and the contents of communications from confidential informants,[34] and in denying motions for dismissal on Speedy Trial Act grounds. The Court has considered these claims and, for the reasons stated in Judge Holshuh's rulings on these matters, finds the claims to be without merit.

### CONCLUSION

Accordingly, the convictions of appellants Mario Adamo, Richard Marsico, Terryu Freeman, Ray Ripley, Jeffrey Linkous, and Winthrop Hong are affirmed. Ectore Garcia's Ohio conviction is reversed on double jeopardy grounds and remanded to the trial court for proceedings vacating the judgment and sentence thereon.

---

**34.** *Accord, United States v. Alonzo,* 571 F.2d 1384, 1387 (5th Cir.1978), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978).